154 F.3d 1025
 29 Envtl. L. Rep. 20,096, 98 Cal. Daily Op.
Serv. 6939,
98 Daily Journal D.A.R. 10,919,
98 Daily Journal D.A.R. 9588
 CITY OF AUBURN, a municipal corporation of the state of
Washington, Petitioner,
v.
The UNITED STATES GOVERNMENT and The Surface Transportation
Board, an agency of the United States Government; King
County, a Washington municipal corporation; Burlington
Northern Santa Fe Corporation, a Delaware corporation;
Burlington Northern Railroad Company, a Delaware
corporation, et al., Respondents.
CITY OF AUBURN, a municipal corporation of the state of
Washington; City of Yakima, a municipal corporation of the
state of Washington; City of Kent, a municipal corporation
of the state of Washington, Petitioners,
v.
U.S. GOVERNMENT; The Surface Transportation Board, an
agency of the United States Government, Respondents,
Burlington Northern Santa Fe Corporation, Burlington
Northern Santa Fe Acquisition, Inc. ("BNSF Acquisition") and
the Burlington Northern and Santa Fe Railway Company
("BN/Santa Fe"), Respondents-Intervenors.
CITY OF AUBURN, a municipal corporation of the state of
Washington, Petitioner,
v.
U.S. GOVERNMENT; The Surface Transportation Board, an
agency of the United States Government, Respondents,
and
Burlington Northern and Santa Fe Railway Company,
Intervenors/Respondents.
 Nos. 96-71051, 97-70022 and 97-70920.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 3, 1998.
Decided Sept. 3, 1998.
As Amended Oct. 20, 1998.
 
 Peter J. Eglick, Helsell Fetterman, Seattle, Washington; Rodney L. Brown, Jr., Marten & Brown, Seattle, Washington; Raymond L. Paolella, Yakima City Attorney's Office, Yakima, Washington, for petitioners.
 
 
 1
 Evelyn G. Kitay, Surface Transportation Board, Department of Transportation, Washington, D.C.; Kathryn A. Kusske and Erika Z. Jones, Mayer, Brown & Platt, Washington, D.C.; Paul J. Lawrence and Marc C. Levy, Preston, Gates & Ellis, Seattle, Washington, for the respondents.
 
 
 2
 Christine O. Gregoire, Matthew A. Love, Neil L. Wise, Office of the Attorney General, Olympia, Washington, for the State of Washington as amicus curiae.
 
 
 3
 Jeffrey R. Moreland, Richard E. Weicher, Michael E. Roper, Sarah J. Whitley, Burlington Northern Santa Fe Corporation, Ft. Worth, Texas; and Erika Z. Jones, Roy T. Englert, Jr., Kathryn A. Kusske, Peter C. Choharis, Mayer, Brown & Platt, Washington, D.C., for Burlington Northern Santa Fe Corporation, BNSF Acquisition Corporation, and The Burlington Northern and Santa Fe Railway Company, as intervenors.
 
 
 4
 Petitions to Review Decisions of The Surface Transportation Board. STB Nos. 33095, 32974 and 33200.
 
 
 5
 Before: LAY,* GOODWIN and PREGERSON, Circuit Judges.
 
 LAY, Circuit Judge:
 
 6
 These appeals arise out of three separate but related decisions of the Surface Transportation Board ("STB"), concerning the reopening of the Stampede Pass railroad line in western Washington state. The City of Auburn[1] challenges the STB's finding of federal preemption of state and local environmental review laws in approval of the reopening of the Stampede Pass line, and objects to the lack of a full Environmental Impact Statement ("EIS"). The Burlington Northern and Santa Fe Railway ("Burlington") has intervened and filed briefs in all three cases.[2]
 
 I. Factual and Procedural Background
 
 7
 The Stampede Pass route is a 229-mile rail line running east-west through the Cascade Mountains of Washington state. The City of Auburn (population 37,000) lies at the line's western terminus, at the junction with the north-south Pacific Coast rail line which connects the ports of Seattle and Tacoma.
 
 
 8
 In the early 1980s, Stampede Pass was one of three main lines serving the Seattle-Tacoma area that were owned and operated by Burlington. In 1986, Burlington sold a 151-mile portion of the Stampede Pass line--between the towns of Cle Elum and Pasco--to the Washington Central Railroad ("Washington Central"). Burlington continued to operate the seventy-eight-mile western segment of the line between Auburn and Cle Elum, providing limited local service.
 
 
 9
 In 1996, Burlington sought approval from the STB to reacquire the eastern segment of Stampede Pass from Washington Central and re-establish the route as a third main rail line in the Pacific Northwest. As part of this plan, Burlington proposed repairs and improvements on the line, which included replacement of track sidings and snow sheds, tunnel improvements, and communication towers. Burlington initially submitted certain permit applications for these projects to local authorities. However, during the permit-review process, Burlington contended that local environmental review was precluded by federal regulation.
 
 
 10
 In response to Burlington's position, King County, Washington, in May 1996 requested an informal opinion from the STB, asking whether the Interstate Commerce Commission Termination Act, codified at 49 U.S.C. § 701 et seq., ("ICCTA")[3] preempted the county's ability to review the environmental impact of proposed operations on the Stampede Pass line. In June 1996, the STB issued an informal opinion that the line was not subject to state and local permit requirements.
 
 
 11
 In August 1996, King County requested a formal declaratory order from the board as to whether the ICCTA preempted the county's environmental review. On September 17, 1996, the City of Auburn wrote to the STB and requested designation as a party of record in the declaratory proceeding. On September 25, 1996, the STB issued its decision in the King County petition, finding federal preemption. See King County Petition for Declaratory Order, STB Finance Docket No. 32974, 1996 WL 545598 (I.C.C. September 25, 1996).[4]
 
 
 12
 In the King County order, the STB denied Auburn's request to intervene, but invited the city to submit its own petition for a declaratory order. See id. at * 5, n.2. Auburn, joined by the City of Kent, followed this advice by filing a separate declaratory order petition on October 11, 1996. In July 1997, the STB denied the cities' petition, stating the action was "treated as a petition for reconsideration of King County." Cities of Auburn and Kent Petition for Declaratory Order, STB Finance Docket No. 33200, 1997 WL 362017, at * 8 (I.C.C. July 2, 1997).[5]
 
 
 13
 While parties were disputing the preemption question, Burlington's petition for approval under 49 U.S.C. §§ 11323-25 to reacquire and conduct improvements on the Stampede Pass line was proceeding. Pursuant to the National Environmental Policy Act, codified at 42 U.S.C. § 4321 et seq. ("NEPA"), the STB's environmental staff in September 1996 prepared an Environmental Assessment ("EA") of Burlington's proposal. After the EA was released, comments were solicited and all interested parties were given an opportunity to respond. After comments were received, a post-EA was prepared to address the concerns raised. The EA and post-EA concluded Burlington's proposal would not have a significant environmental impact, if certain mitigation measures were implemented.
 
 
 14
 The STB approved Burlington's proposal in October 1996. See Burlington Northern Decision, STB Finance Docket No. 32974, 1996 WL 614254 (I.C.C. October 25, 1996). That action is now challenged by the City of Auburn.
 
 II. Federal Preemption
 
 15
 Auburn asserts that the STB erred in finding federal preemption of state and local environmental permitting laws because the ICCTA legislative history establishes Congress' intent to preempt only economic regulation of rail transportation, not the traditional state police power of environmental review. The city points to a report from the House Transportation and Infrastructure Committee, which indicates that in passing the ICCTA, Congress meant to "occupy[ ] the entire field of economic regulation of the interstate rail transportation system," but retain for the states "the police powers reserved by the Constitution." H.R.Rep. No. 104-311, 104th Cong., 1st Sess., at 95-96 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 807-08. Auburn argues that the local regulations at issue are not economic regulations, but rather "essential local police power required to protect the health and safety of citizens...." Auburn Br., No. 97-70920, at 25.
 
 
 16
 Additionally, the city argues that the ICCTA contains no provision expressly preempting state and local land use and environmental regulations. It contends that because of the presumption against preemption in fields traditionally occupied by the states, none of the express language in the ICCTA can be read to usurp local environmental review.
 
 
 17
 We begin by first noting that Congress and the courts long have recognized a need to regulate railroad operations at the federal level. Congress' authority under the Commerce Clause to regulate the railroads is well established, see, e.g., Houston, E. & W. Tex. Ry. v. United States, 234 U.S. 342, 350-52, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); Pittsburgh & Lake Erie R.R. v. Railway Labor Executives Ass'n, 491 U.S. 490, 510, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989), and the Supreme Court repeatedly has recognized the preclusive effect of federal legislation in this area. See, e.g., Colorado v. United States, 271 U.S. 153, 165-66, 46 S.Ct. 452, 70 L.Ed. 878 (1926) (ICC abandonment authority is plenary and exclusive); Transit Comm'n v. United States, 289 U.S. 121, 127-28, 53 S.Ct. 536, 77 L.Ed. 1075 (1933) (ICC authority over interstate rail construction is exclusive); City of Chicago v. Atchison, T. & S.F. Ry., 357 U.S. 77, 88-89, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958) (local authorities have no power to regulate interstate rail passengers). The Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), which, as amended, still governs federal regulation of railroads, has been recognized as "among the most pervasive and comprehensive of federal regulatory schemes." Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981).[6]
 
 
 18
 Second, we note that Auburn places great reliance on the legislative history of the ICCTA. However, while "[l]egislative history can be a legitimate guide to a statutory purpose obscured by ambiguity ... in the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive." Burlington Northern R.R. v. Oklahoma Tax Comm'n, 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) (internal quotations omitted). "The starting point in statutory interpretation is 'the language [of the statute] itself,' " United States v. James, 478 U.S. 597, 604, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)), and where statutory command is straightforward, "there is no reason to resort to legislative history." United States v. Gonzales, 520 U.S. 1, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997).
 
 
 19
 We find that the plain language of two sections of the ICCTA explicitly grant the STB exclusive authority over railway projects like Stampede Pass. Section 10501 of the ICCTA, which governs the STB's jurisdiction, states the board will have exclusive jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State." 49 U.S.C. § 10501(b)(2) (1997). The same section states that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b) (1997).
 
 
 20
 Additionally, the statute expressly provides that in a merger or acquisition transaction approved under 49 U.S.C. § 11323-25, "[a] rail carrier ... participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including state and municipal law, as necessary to let that rail carrier ... hold, maintain, and operate property ... acquired through the transaction." 49 U.S.C. § 11321(a) (1997) (emphasis added). The section unambiguously states: "The authority of the Board under this subchapter is exclusive." Id. (emphasis added).
 
 
 21
 The preemptive effect of the ICCTA, which went into effect January 1, 1996, is a question of first impression on the appellate level of this circuit. The district courts which have had the opportunity to examine this question have applied federal preemption. Despite the petitioner's claims to the contrary, the reasoning of these courts support preemption in this case as well.
 
 
 22
 In CSX Transp., Inc. v. Georgia Public Service Comm'n, 944 F.Supp. 1573 (N.D.Ga.1996), the district court found § 10501(b)(2)'s preemption of state regulation of railroad agency closings by stating: "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." 944 F.Supp. at 1581. "Interpreting the preemption clause in the ICC Termination Act to be broad enough to preempt state regulation of agency closings," the court stated, "is consistent with the Act's grant of exclusive jurisdiction over almost all matters of rail regulation to the STB." Id.
 
 
 23
 The Montana district court in Burlington Northern Santa Fe Corp. v. Anderson, 959 F.Supp. 1288, 1294-95 (D.Mont.1997), made a similar broad reading of the ICCTA to find preemption of state regulation of railroad agencies. "Legislative history supports this analysis," the court stated, "as Congress noted that the 'Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive.' " 959 F.Supp. at 1295 (quoting H.R.Rep. No. 104-311, 104th Cong., 1st Sess., at 96 (1995), reprinted in U.S.C.C.A.N. 793, 808).
 
 
 24
 In fact, there is nothing in the case law that supports Auburn's argument that, through the ICCTA, Congress only intended preemption of economic regulation of the railroads. All the cases cited by the parties find a broad reading of Congress' preemption intent, not a narrow one. See also Georgia Public Service Comm'n v. CSX Transp., Inc., 225 Ga.App. 787, 484 S.E.2d 799, 801 (1997); In re Burlington Northern R.R., 249 Neb. 821, 545 N.W.2d 749, 751 (1996).
 
 
 25
 Pre-ICCTA case law addressing federal preemption over railroad operations also supports a broad reading of the statute. In Norfolk & Western Ry. v. American Train Dispatchers Ass'n, 499 U.S. 117, 127-34, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991), the Supreme Court found broad preemption in § 11341(a), which, as amended by the ICCTA, is now § 11321(a). The Court stated: "The contested language in § 11341(a), exempting carriers from 'the antitrust laws and all other law, including State and municipal law,' is clear, broad, and unqualified." 499 U.S. at 128, 111 S.Ct. 1156. "By itself," the court concluded, "the phrase 'all other law' indicates no limitation." Id. at 129, 111 S.Ct. 1156.
 
 
 26
 These court decisions interpreting the preemptive scope of the ICCTA also are consistent with decisions of courts addressing similar questions under federal laws with similarly broad preemptive scope. See, e.g., California v. Federal Energy Regulatory Comm'n, 495 U.S. 490, 506-07, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990) (preempting state water flow requirements designed to protect trout); Sayles Hydro Associates v. Maughan, 985 F.2d 451, 456 (9th Cir.1993) (preempting state permitting of a hydroelectric project); Burbank-Glendale-Pasadena Airport Auth. v. City of Los Angeles, 979 F.2d 1338, 1340-41 (9th Cir.1992) (finding federal preemption of local airport construction ordinances).
 
 
 27
 Auburn attempts to distinguish its permitting requirements as environmental rather than economic regulation, claiming this is a "traditional state police power" that Congress did not intend to preempt. It correctly points out that courts have declined to preempt state environmental regulation in some other contexts. See, e.g., Chevron U.S.A., Inc. v. Hammond, 726 F.2d 483, 501 (9th Cir.1984). However, the pivotal question is not the nature of the state regulation, but the language and congressional intent of the specific federal statute. See, e.g., Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 738, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (Preemption of state law is compelled if Congress' command is explicitly stated in the federal statute's language or implicitly contained in its structure or purpose.)
 
 
 28
 For example, in Hammond, the court allowed an Alaska statute governing the discharge of ballast by oil tankers after finding that in the Clean Water Act, Congress "clearly expressed its intent to allow the states to take an active role in abating water pollution." 726 F.2d at 489. In contrast, there is no evidence that Congress intended any such state role under the ICCTA to regulate the railroads.
 
 
 29
 Additionally, given the broad language of § 10501(b)(2), (granting the STB exclusive jurisdiction over construction, acquisition, operation, abandonment, or discontinuance of rail lines) the distinction between "economic" and "environmental" regulation begins to blur. For if local authorities have the ability to impose "environmental" permitting regulations on the railroad, such power will in fact amount to "economic regulation" if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line.
 
 
 30
 We believe the congressional intent to preempt this kind of state and local regulation of rail lines is explicit in the plain language of the ICCTA and the statutory framework surrounding it. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).[7] Because congressional intent is clear, and the preemption of rail activity is a valid exercise of congressional power under the Commerce Clause, we affirm the STB's finding of federal preemption.
 
 
 31
 III. Environmental Assessment of the Stampede Pass Reopening
 
 
 32
 The NEPA requires federal agencies to prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1994). However, under federal regulations promulgated by the Council on Environmental Quality, the responsible agency will first prepare an Environmental Assessment to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1) (1997). Under ICC regulations, the only environmental review necessary in the usual merger proceeding is the preparation of an EA, discussing the impact of additional train traffic due to the merger. See 49 C.F.R. § 1105.6(b)(4) (1997).
 
 
 33
 Auburn contends the STB abused its discretion by failing to take the necessary "hard look" at the possible environmental consequences of Burlington's proposal. It claims the board ignored evidence regarding the traffic and noise impact of the reopening on the city. The city also maintains the STB violated the NEPA by failing to present and analyze alternatives to the proposal, and claims the mitigation supporting the board's finding of no significant impact is "vague, conclusory, and ineffective." Auburn Br., No. 97-70022, at 47.[8]
 
 
 34
 We begin by noting that an appellate court gives great deference to an agency determination regarding NEPA requirements. See Friends of Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 993 (9th Cir.1993); Greenpeace Action v. Franklin, 14 F.3d 1324, 1331 (9th Cir.1992). The petitioner must make a showing that the STB's determination not to conduct a full EIS was arbitrary, capricious, or an abuse of discretion. See id. While the petitioner argues that the board did not take the requisite "hard look" at the environmental issues in this case, we believe that the record belies this assertion.
 
 
 35
 The EA produced by the STB is more than sixty pages long. It addresses environmental concerns such as rail traffic increases, transportation safety, energy, air quality, and noise. In addition, the post-EA produced by the board lays out a long list of mitigation measures.[9] These documents demonstrate that the STB conducted a thorough, independent investigation of the environmental consequences of the Stampede Pass line reopening as mandated by law. Auburn disputes the STB's assessment of potential environmental impact, but that alone does not render the board's findings arbitrary and capricious. Even if one may dispute the results, the EA appears to be the "hard look" at the factual issues an agency is required to conduct.
 
 
 36
 As a reviewing court, "[w]e are not free to substitute our judgment for that of the agency as to the environmental consequences of its actions.... Instead, our task 'is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.' " Association of Pub. Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1183 (9th Cir.1997) (quoting Baltimore Gas & Elec. Co. v. Natural Resources Defense, Inc., 462 U.S. 87, 97-98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).
 
 
 37
 We also find that the affected cities were given ample opportunity to raise their environmental concerns before the board for the requisite consideration. After the initial EA was released, comments were solicited and all interested parties were given an opportunity to respond. Following comments from the parties, the STB issued its post-EA addressing the parties' concerns. "Because NEPA is essentially a procedural statute, an agency's actions under NEPA are generally reviewed to determine if the agency observed the appropriate procedural requirements." Northcoast Envtl. Ctr., 136 F.3d at 665. The STB in this case "observed the appropriate procedural requirements," allowed for public comment, and properly informed the public of the environmental issues. This was all that was required of the STB under the NEPA's statutory guidelines.
 
 
 38
 Regarding mitigation, it is clear that an agency may condition its decision not to prepare a full EIS on adoption of mitigation measures. See, e.g., Jones v. Gordon, 792 F.2d 821, 829 (9th Cir.1986); The Steamboaters v. Federal Energy Regulatory Comm'n, 759 F.2d 1382, 1394 (9th Cir.1985). The STB developed three specific mitigation conditions (notice of expected train movements, discussion of funding options for crossing upgrades, and spacing of train movements to allow time for crossings to clear) to address the city's main concern of traffic delays at rail crossings. While the board denied the city's request to require construction of grade-separated crossings, there is no showing that this denial alone renders the mitigation measures inadequate.
 
 
 39
 Additionally, we find no merit in the petitioner's claim that the STB failed to properly consider alternatives to Burlington's proposal to re-establish Stampede Pass as a major line. The EA and post-EA specifically recognized that the NEPA requires an agency to consider alternatives to the action that are feasible or reasonable. The STB permissibly concluded that "alternatives" such as using trucks instead of rail lines to transport goods are really no alternative at all, because "the two railroads would forego the expected improved service capabilities and increased operating efficiencies that this proposal is meant to achieve." ER, Vol V, Tab HH at 22.
 
 
 40
 Finally, we find the parameters of the EA set by the STB, which exclude the impact of the upgrading and rehabilitating of the portion of the rail line already owned by Burlington, do not constitute an abuse of discretion. There is no showing the STB's determination that those impacts fell outside of its jurisdiction under this proceeding constitutes an arbitrary and capricious finding. The only action requiring approval by the board was the proposed sale of the eastern segment of the Stampede Pass line to Burlington. It therefore was entirely reasonable for the STB to limit its environmental review to effects that would flow directly, from the approval of the sale.
 
 IV. Conclusion
 
 41
 The STB's denial of the City of Auburn's request to intervene in the 1996 declaratory relief proceeding brought by King County is moot, because the city was granted a separate proceeding and because this court now has ruled on the preemption issue. State and local permitting laws regarding railroad operations are preempted by the plain language of the ICCTA, and the statutory framework surrounding it. Finally, there is no showing that the STB abused its discretion or rendered a ruling that is arbitrary and capricious by approving the Stampede Pass line reopening without conducting a full EIS. For these reasons, we find the rulings of the STB should be AFFIRMED.
 
 
 
 *
 Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The cities of Yakima, Washington, and Kent, Washington, were originally parties to the appeal in case No. 97-70022. The cities reached settlement agreements with Burlington on July 20, 1998, and August 5, 1998. The City of Kent's appeal has been dismissed with prejudice. The City of Yakima's appeal is pending final consummation of the settlement agreement
 
 
 [2]
 Amicus briefs have been filed in case No. 97-70920, by the State of Washington, the National League of Cities, and the Association of American Railroads
 
 
 [3]
 The ICCTA abolished the Interstate Commerce Commission, created the STB, and granted the board jurisdiction over certain interstate rail functions and proceedings. See the ICC Termination Act, Pub.L. No. 104-88, 109 Stat. 803 (1995)
 
 
 [4]
 Auburn filed a petition with the Ninth Circuit in November 1996 for review of the board's King County decision. In March 1997, this court dismissed the city's appeal in part, finding the city lacked standing to obtain review on the merits because it was not a party to the proceedings below. See City of Auburn v. United States, No. 96-71051 (9th Cir. March 26, 1997) (order granting in part motion to dismiss)
 
 
 [5]
 Auburn has also filed a separate appeal, No. 96-71051, consolidated with the present appeal, contending it was denied party status in the earlier King County petition despite a specific request that the STB not rule on the preemption issue until the city had an opportunity to make a submission. The law is quite clear that an appeal should be dismissed as moot if the occurrence of intervening events renders a decision unnecessary. See, e.g., American Casualty Co. v. Baker, 22 F.3d 880, 896 (9th Cir.1994); Carter v. Veterans Admin., 780 F.2d 1479, 1481 (9th Cir.1986). We hold this appeal moot. The record makes clear that "interim relief or events have deprived the court of the ability to redress the party's injuries." United States v. Alder Creek Water Co., 823 F.2d 343, 345 (9th Cir.1987)
 It is difficult to understand how the relief Auburn now seeks, the reopening of King County so that the city may intervene, is any different from the relief it received--a hearing on its own petition. Both petitions dealt with the identical issue concerning ICCTA preemption of local environmental permitting laws. Because the concerns of the city already have been raised and considered, any order by this court for the STB to do so--again--would be redundant. In effect, the controversy has been addressed, and this court now lacks the power to address it any further. See Enrico's, Inc. v. Rice, 730 F.2d 1250, 1254 (9th Cir.1984) ("Where events have occurred that prevent us from granting effective relief, we lack jurisdiction and must dismiss the appeal.").
 It also makes little sense to order the STB to reopen the King County petition now, when the question addressed in the petition is being decided by this court in case No. 97-70920. See Part II infra.
 
 
 [6]
 In 1980, Congress took additional steps to reduce regulatory authority of the states over interstate rail lines by passing the Staggers Rail Act, Pub.L. No. 96-448, 94 Stat. 1895 (1980). Before 1980, the ICC was empowered to preempt state regulation of intrastate lines only when an intrastate rate set by the state unjustly discriminated against or imposed an undue burden on interstate commerce. In the Staggers Act, Congress expressly provided that states could only regulate if they applied federal standards. See Interstate Commerce Comm'n v. Texas, 479 U.S. 450, 453-54, 107 S.Ct. 787, 93 L.Ed.2d 809 (1987)
 
 
 [7]
 Because we find the Congress explicitly preempted state and local regulation of the Stampede Pass reopening, it is unnecessary to apply either a conflict preemption or field preemption analysis to the issue. See Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981) (When a court finds the terms of a statute unambiguous, judicial inquiry is complete.)
 
 
 [8]
 Auburn also argues that an attached affidavit of Auburn's city traffic engineer, not available at the time of the STB decision, now should be considered by this court to provide "clarification of technical issues." Auburn Br., No. 97-70022, at 61-62. However, this court repeatedly has stated that judicial review in NEPA cases almost always should be based upon the record presented to the agency. See, e.g., Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 665 (9th Cir.1998); National Audubon Society v. United States Forest Serv., 46 F.3d 1437, 1447 (9th Cir.1993); Animal Defense Council v. Hodel, 840 F.2d 1432, 1436 (9th Cir.1988), modified, 867 F.2d 1244 (9th Cir.1989). This rule is in keeping with the court's limited review of determining only whether the agency's decision was made in arbitrary and capricious manner. Auburn fails to demonstrate why an exception to the general rule should be made in this case
 
 
 [9]
 Mitigation measures recommended by the post-EA and adopted by the STB require the railroad to: 1) give notice to the towns of train schedules; 2) provide copies of all applicable Emergency Response Plans; 3) provide an 800 number to all local emergency response forces; 4) transport all hazardous materials in compliance with U.S. Department of Transportation regulations; 5) consult with state and local officials to develop a priority list and discuss "funding options" for crossing signal upgrades; 6) space train movements to allow for grade crossings to clear; 7) operate trains to reduce locomotive fuel consumption and air pollution; 8) within 30 days of the effective date of the board's decision, consult with the Washington Department of Fish and Wildlife to facilitate: a) maximum protection of the Yakima and Green rivers, b) vegetation control along the right of way as a means of fire suppression management, c) wildlife movement and access to water, d) minimal adverse impacts on wildlife and protection of water quality, and e) provision, placement and maintenance of fire suppression vehicles in the Yakima Canyon area; 9) prevent, contain, and control any fire that may occur; 10) apply only herbicides registered with the U.S. Environmental Protection Agency; 11) install and maintain, if requested, protective fencing in recreation areas; 12) provide an 800 number to facilitate communication between local communities and the railroad, and 13) consult with state and local authorities to identify grade crossings where temporary signs should be posted to alert motorists of increased rail traffic. See ER Vol. V, Tab HH, pp. 22-26