Reversed and Remanded and Majority and Concurring Opinions filed May 12,
2005









 

Reversed and Remanded and Majority and Concurring
Opinions filed May 12, 2005.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-03-01311-CV

____________

 

THE BURLINGTON
NORTHERN AND SANTA FE RAILWAY COMPANY, Appellant

 

V.

 

THE CITY OF
HOUSTON, TEXAS,
Appellee

 



 

On Appeal from the County
Civil Court at Law No. 4

Harris County, Texas

Trial Court Cause No. 789,496

 



 

M A J O R I T Y   O P I N I O N

In this condemnation suit, appellant, The
Burlington Northern and Santa Fe Railway Company (“BNSF”), is attempting to
condemn an easement to build a federally-approved rail line through property
owned by appellee, The City of Houston. 
BNSF appeals from the county court’s dismissal of its condemnation
suit.  We reverse and remand.

                                                  BACKGROUND








It has long been
national policy to promote an adequate and efficient rail transportation
service.  Norfolk & W. Ry. v. Am.
Train Dispatchers’ Ass’n, 499 U.S. 117, 119 (1991).  In 1995, Congress passed the Interstate
Commerce Commission Termination Act (“ICCTA”), which reinforced the federal
government’s continued goals “to promote a safe and efficient rail
transportation system” and “to ensure development and continuation of a sound
rail transportation system with effective competition among rail carriers.”  49 U.S.C. § 10101(3), (4) (2000).  To accomplish these and other goals, the
ICCTA abolished the former Interstate Commerce Commission and created the
Surface Transportation Board (“STB”), which has exclusive jurisdiction over
transportation by rail carriers and the construction and operation of rail
tracks.  Id. § 10501(b).

Pursuant to its broad statutory powers,
the STB played an integral role in the 1996 merger between Union Pacific (“UP”)
and Southern Pacific (“SP”), which was the largest merger in American railroad
history.  In determining whether to
approve the merger, the STB examined its impact on existing service and
competition.  The Bayport District in
southeast Houston contains one of the largest concentrations of petrochemical
producers in the world.  Before 1996, SP
was the sole rail service provider to this area through its Strang Subdivision
line.  However, the Bayport District was
within a few miles of a nearby UP line called the GH&H line, which allowed
for the possibility of competition through a build-out from the GH&H line
to the Bayport District.  Because the
merger would result in UP owning both the Strang Subdivision and GH&H lines
and therefore render the shippers in the Bayport District captive to UP, as a
condition of the merger, the STB required UP to give its next largest remaining
competitor, BNSF, trackage rights on the GH&H line.  See Union Pac. Corp. – Control &
Merger – S. Pac. Rail Corp., STB Finance Docket No. 32760, 1996 WL 467636,
at *7 (1996).  These trackage rights would
allow BNSF to build-out from the GH&H line to provide service to the
Bayport District, thereby preserving the possibility of competition.








In June 2001, BNSF formed a Delaware
limited partnership called San Jacinto Rail Limited (“SJRL”) with four shippers
in the Bayport District.  The purpose of
this partnership, of which BNSF was the dominant partner,[1]
was to build a rail line from the GH&H line to the Bayport District using
the trackage rights BNSF obtained in the UP/SP merger.  Under their agreement, SJRL is to build the
line, and BNSF is to have exclusive operational control.[2]  In August 2001, BNSF and SJRL filed a
petition with the STB seeking authority for SJRL to construct and BNSF to
operate this new 12.8 mile line.  BNSF
would be a common carrier and provide service to the four shippers partnered
with BNSF as well as any other shipper who so requested.

In response to this petition, the STB
initiated its lengthy evaluation process, including assessing the potential
environmental impacts of the proposed rail line.  This environmental impact assessment includes
an analysis of a broad range of potential issues, including safety; noise and
vibration; impacts on air, water, and soil; land use; hazardous materials
issues; socioeconomics; cultural resources; and environmental justice.  The STB sought public input in many ways, including
establishing a toll-free hotline and holding two public meetings.  The meetings were attended by nearly 200
people, and the STB received hundreds of written comments.  In August 2002, the STB approved the proposal
to build a new rail line, subject to the results of the ongoing environmental
impact study.  The STB explained that
building this new line was in the public interest and consistent with national
rail transportation policy in that it would allow suppliers to realize the
benefits of competition and fulfill a condition of the UP/SP merger.  The STB later issued a draft environmental
impact statement and, after more public meetings and considering hundreds more
written comments, a final environmental impact statement.  Both the draft and the final statement were
each several hundred pages long.








The STB studied in detail five proposed
routes for the line, each of which would run through the City’s property.  The City actively participated in the STB’s
assessment process, submitting detailed comments to the draft environmental
impact statement and objecting to each of the proposed routes.  The City even passed a resolution declaring
its opposition to every route under consideration.  BNSF worked with the STB to develop a route,
called Route 1-C, to address some of the City’s objections, but the City
opposed this route as well.  The STB
determined that the new line would pose no significant environmental threats
and approved all five lines, designating Route 1-C as the preferred route.

Route 1-C is to run through an undeveloped
portion of Ellington Field, which is one of three airports in the Houston
Airport System.  Ellington Field is a
small airport used mostly by the military and for corporate and private general
aviation.  It has been a constant
financial drain on the airport system, and the City hopes to reverse that.  The City objected to Route 1-C, claiming it
would interfere with plans to develop the property for aviation-related
business because, among other things, the line would bisect the property, allow
the transportation of hazardous materials, and make access to the property more
difficult, thereby decreasing its marketability.  The City also believes construction of the
line would prevent the City from building a new road to make the property more
accessible and relieve severe traffic congestion on nearby residential
roads.  The City presented these concerns
and others to the STB, and the STB concluded that the proposed line would not
significantly interfere with any reasonably foreseeable use the City had for
its property.

The City filed a motion for
reconsideration of the STB’s decision and a motion for stay pending judicial
review, see 49 C.F.R. § 1115.5(a) (2004), both of which the STB
rejected.  The City then filed a notice
of appeal with the Fifth Circuit Court of Appeals, but the City dismissed that
appeal, thereby making the STB’s decision final.  See 28 U.S.C. §§ 2321(a), 2342(5),
2344 (2000).








BNSF then attempted to purchase the
necessary easement from the City to build along Route 1-C, but the City refused
to sell.  Therefore, BNSF commenced a
condemnation action under Tex. Rev. Civ.
Stat. Ann. art. 6336 (Vernon 1926), which authorizes a railroad to
condemn land.[3]  The City filed a plea to the jurisdiction,
claiming immunity from suit and that BNSF had no right to take the property.[4]  BNSF responded to each of the City’s points
and also asserted federal preemption. 
After a two-day trial, the county court dismissed the condemnation
suit.  In its findings of fact and
conclusions of law, the court rejected BNSF’s preemption argument, determining
that state law controls, and found that although the City’s sovereign immunity
had been waived, BNSF did not have the right to take the property under state
law.








In its first two issues, BNSF challenges
the county court’s conclusion that BNSF had no right to condemn the City’s
property under state law and asserts that, in any event, the county court’s
interpretation and application of state law conflicts with federal law and is
therefore preempted.  In its third issue,
BNSF asserts that the county court erred in rejecting two of its three theories
as to why the City’s sovereign immunity has been waived.  In its third cross-issue, the City challenges
the county court’s ruling that its sovereign immunity has been waived.  In its first and second cross-issues, the City
provides two alternative state law grounds it contends are bases for affirming
the county court’s judgment.  We conclude
that the City’s sovereign immunity has been waived and that federal preemption
precludes the county court’s application of its interpretation of state law,
and therefore we reverse and remand.

                                                      ANALYSIS

Our review of the county court’s ruling on
a plea to the jurisdiction is de novo, as is our review of the county court’s
conclusions of law and statutory interpretation.  See Nipper-Bertram Trust v. Aldine Indep.
Sch. Dist., 76 S.W.3d 788, 791 (Tex. App.—Houston [14th Dist.] 2002, pet.
denied); TRST Corpus, Inc. v. Fin. Ctr., Inc., 9 S.W.3d 316, 320 (Tex.
App.—Houston [14th Dist.] 1999, pet. denied). 
Attacks on the county court’s factual findings are governed by a legal
and factual sufficiency standard of review. 
See Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).

                                               Sovereign
Immunity

Sovereign immunity bars suits against the
state unless the state has consented to suit. 
Tex. Natural Res. Conservation Comm’n v. IT-Davy, 74 S.W.3d 849,
853 (Tex. 2002).  Cities, as political
subdivisions of the state, are entitled to sovereign immunity unless it has
been waived.  San Antonio Indep. Sch.
Dist. v. McKinney, 936 S.W.2d 279, 283 (Tex. 1996).

BNSF argues that immunity had been waived
three ways:  (1) by article 6336, which
grants a railroad corporation the right to condemn “any real estate,” under
certain circumstances, (2) by Local Government Code section 51.075, which
states that a home-rule municipality such as the City “may plead and be
impleaded in any court,” Tex. Loc. Gov’t
Code Ann. § 51.075 (Vernon 1999), and (3) by a provision in the City’s
charter that says the City may “sue and be sued” and may “implead and be
impleaded.”  The county court found that
the railroad condemnation statutes constituted an express waiver of
immunity.  The City challenges this
finding in its third cross-issue.  The
county court rejected BNSF’s other two theories, and BNSF complains of this in
its third issue.








After the county court’s ruling, this
court determined that Local Government Code section 51.075 constitutes a waiver
of the City’s sovereign immunity.  City
of Houston v. Clear Channel Outdoor, Inc., No. 14-03-00022-CV, ___ S.W.3d
___, 2004 WL 62561, at *4 (Tex. App.—Houston [14th Dist.] Jan. 15, 2004, pet.
filed).  Therefore, we sustain BNSF’s
third issue as it relates to section 51.075. 
We need not reach the City’s third cross-issue that the railroad
condemnation statutes do not waive immunity since the City’s immunity has been
waived on another basis.

                                               Federal
Preemption








The county court’s ruling that BNSF did
not have the right to condemn the City’s property under state law was based on
three separate conclusions.  First, only
railroad corporations have condemnation power under article 6336 and SJRL is
not a railroad corporation.  BNSF is the
condemning entity, but it has agreed to transfer the condemned easement to
SJRL, who is to build the rail line. 
Article 6336 provides that a railroad corporation can condemn for any
lawful purpose connected with building or operating “its road.”  The county court concluded that BNSF could
not contract away its power of condemnation and since SJRL, not BNSF, would be
the ultimate owner, the condemnation was unlawful since BNSF would not be
condemning for “its road.”  Second,
article 6336 provides that a railroad corporation may not condemn any land
“situated more than two miles from the right of way of such railroad
corporation.”  BNSF has trackage rights
on the GH&H line, but the county court concluded that trackage rights are
not a sufficient right of way under the statute because they are not fee simple
ownership.  Since BNSF has no other right
of way within two miles of the property it is seeking to condemn, the county
court concluded that condemnation was improper. 
Finally, under the common-law paramount public use test,[5]
the county court concluded that construction of the rail line would practically
destroy the City’s plans of future aviation-related development at Ellington
Field and construction of a new access road and that the City’s planned public
use was paramount to the public benefit of constructing the rail line.

BNSF challenges the correctness of the
county court’s interpretation of article 6336 and its conclusions in applying
the paramount public use test.  We need
not determine whether the county court’s interpretation and application of
state law is correct because, even if correct, it conflicts with federal law
and is therefore preempted.

Preemption of state law by federal law is
rooted in the Supremacy Clause of the United States Constitution.  U.S.
Const. art. VI, cl. 2.  The
Supreme Court has determined that federal preemption can arise in three ways:
(1) when Congress expressly provides that state law is preempted, (2) when
congressional intent to exclusively occupy the field can be inferred from
pervasive federal regulation, and (3) when state law actually conflicts with
federal law.  English v. Gen. Elec. Co.,
496 U.S. 72, 78–79 (1990).

Where a statute contains a specific
preemption clause, as does the ICCTA, that clause becomes the focus of our
analysis.  Friberg v. Kansas City S.
Ry., 267 F.3d 439, 442 (5th Cir. 2001). 
The ICCTA section entitled “General Jurisdiction” states, in relevant
part:

(b) The jurisdiction of the Board
over‑‑

(1) transportation by rail
carriers, and the remedies provided in this part with respect to rates,
classifications, rules (including car service, interchange, and other operating
rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition,
operation, abandonment, or discontinuance of spur, industrial, team, switching,
or side tracks, or facilities, even if the tracks are located, or intended to
be located, entirely in one State,

is exclusive.
Except as otherwise provided in this part, the remedies provided under this
part with respect to regulation of rail transportation are exclusive and
preempt the remedies provided under Federal or State law.   








49 U.S.C. § 10501. 
As the Fifth Circuit stated in Friberg, “[t]he language of the
statute could not be more precise.”  267
F.3d at 443.  Courts have consistently
interpreted this preemption language to be broad in scope.  See, e.g., id.; City of
Auburn v. United States, 154 F.3d 1025, 1030–31 (9th Cir. 1998); Dakota,
Minn. & E. R.R. Corp. v. South Dakota, 236 F. Supp. 2d 989, 1005
(D.S.D. 2002), aff’d in part & rev’d in part on other grounds, 362
F.3d 512 (8th Cir. 2004); Wis. Cent. Ltd. v. City of Marshfield, 160 F.
Supp. 2d 1009, 1013 (W.D. Wis. 2000). 
Indeed, “[i]t is difficult to imagine a broader statement of Congress’s
intent to preempt state regulatory authority over railroad operations.”  CSX Transp., Inc. v. Georgia Pub. Serv.
Comm’n, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996).  As such, under principles of express and
conflict preemption, courts have found that state laws that constitute
regulation of a railroad are preempted.  See,
e.g., Friberg, 267 F.3d at 443; City of Auburn, 154 F.3d at
1031; South Dakota, 236 F. Supp. 2d at 1006–07; Wis. Cent., 160
F. Supp. 2d at 1013–14.








In South Dakota, the court analyzed
preemption in the context of South Dakota’s eminent domain law.  The railroad there applied to the STB for
authority to build a new rail line, which the STB eventually approved.  236 F. Supp. 2d at 996.  While the railroad was waiting for the STB’s
approval, the state amended its formerly broad eminent domain law and added
many new restrictions on a railroad’s ability to condemn property.  Id. at 997–98.  Primarily at issue were the requirements
that, before it could condemn property, a railroad have 100% financing for the
project arranged and file a plat describing in intricate detail the exact route
of the rail line.  Id. at
998.  The court found that both
provisions constituted an impermissible regulation of the railroad and were
expressly preempted because they would pose an “insurmountable barrier” for the
railroad and therefore “completely block[]” and “wholly prevent” the project.[6]  Id. at 1006–07; see also City
of Auburn, 154 F.3d at 1031 (concluding that any state law that prevents a
railroad from constructing or operating a line constitutes an impermissible
regulation); Wis. Cent., 160 F. Supp. 2d at 1013–14 (finding that city’s
attempt to condemn railroad property constituted a regulation and was therefore
expressly preempted).

Here, the conditions the county court
imposed on BNSF’s use of its condemnation authority amount to regulation.  The STB approved a new rail line to be owned
and constructed by SJRL and operated by BNSF, its predominant partner.  Under the county court’s interpretation of
article 6336, which focuses on the phrase “its road,” BNSF and SJRL can never
construct and operate the line in the manner approved by the STB.  Similarly, because the STB-approved routes
are not within two miles of any property BNSF owns, the county court’s
interpretation of the phrase “right of way” to require fee simple ownership as
opposed to trackage rights means that BNSF cannot use its trackage rights on the
GH&H line (acquired by STB order) to build the new line.  Because these conditions wholly prevent
construction of the STB-approved rail line, they constitute regulation and are
preempted as applied to BNSF in these circumstances.  See City of Auburn, 154 F.3d at 1031; South
Dakota, 236 F. Supp. 2d at 1006–07; Wis. Cent., 160 F. Supp. 2d at
1013–14.








The county court also applied the
paramount public use test in a manner as to block the rail line.  The STB, in its extensive two-year evaluation
and approval process, reviewed the City’s concerns over the proposed routes as
well as hundreds of other comments and concluded that construction of this
line, with eighty mitigating measures in place, was in the public interest and
important to promote national rail transportation policy.  The county court’s application of the
paramount public use test re-balanced a portion of these interests and placed
the City’s planned uses over the public interest and national rail
transportation policies as determined by the STB, the agency with the expertise
and exclusive jurisdiction to make such determinations.  As such, the county court’s application of
the paramount public use test in these circumstances amounts to impermissible
second-guessing of the agency’s expertise and would prevent construction of the
STB-approved rail line.  See Chicago
& N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 326
(1981) (“Because Congress granted the exclusive discretion to make such
judgments to the Commission, there is no further role that the state court
could play.”).  Therefore, it is
preempted as well.  See City of Auburn,
154 F.3d at 1031; South Dakota, 236 F. Supp. 2d at 1006–07; Wis.
Cent., 160 F. Supp. 2d at 1013–14.

The City claims that South Dakota
supports its argument that the county court’s application of the railroad
condemnation statute and the paramount public use test are not preempted in
this case.  As the South Dakota
court noted, even the STB has acknowledged that eminent domain is a question of
state law and a railroad is responsible for obtaining the land necessary to
complete the project.  236 F. Supp. 2d at
1009.  “Thus STB approval of the [rail]
project does not carry with it any federal power to take the land to complete
the project.  For such authority, [the
railroad] is wholly dependent upon the State of South Dakota.”  Id. 
Because of this, the South Dakota court concluded that Congress
did not intend the ICCTA to preempt the field of eminent domain law.  Id. 
However, BNSF does not argue, and we do not hold, that the entire field
of eminent domain law is preempted. 
Rather, we have determined that when state eminent domain law, as
applied in the circumstances, amounts to a regulation by blocking a federally-approved
rail line, it is expressly preempted.[7]  The City also points to the court’s finding
that other portions of South Dakota’s eminent domain statute requiring a
showing of public use and necessity were not preempted.  Id. at 1012.  However, unlike in the present case, there
was no indication that this requirement would completely prohibit construction
of the rail line.  See id.  

Therefore, we sustain BNSF’s first and
second issues to the extent BNSF contends the county court’s interpretation and
application of state law is preempted.[8]








In its first cross-issue, the City argues that BNSF cannot
use its condemnation power in this case because the City, as a home-rule
municipality, has the authority to prohibit the use of its grounds by a
railroad.  Tex. Rev. Civ. Stat. Ann. art. 1175, § 1 (Vernon Supp.
2004–2005).  A railroad’s condemnation
authority originated from the Texas Constitution,[9]
and the legislature has specifically authorized a railroad corporation to
condemn “any real estate” if it cannot agree with the owner for purchase and to
construct and operate a railroad “between any points within this State,”
including on public lands.  See Tex. Rev. Civ. Stat. Ann. arts. 6316,
6317, 6336 (Vernon 1929).  Thus, even
assuming article 1175 somehow trumps the legislature’s specific grant of
condemnation authority,[10]
the City’s refusal to consent to any route (all of which run through the City’s
property) is but another form of regulation that prevents construction of this
federally-approved line and is therefore preempted.  See City of Auburn, 154 F.3d at
1031; South Dakota, 236 F. Supp. 2d at 1006–07; Wis. Cent., 160
F. Supp. 2d at 1013–14.  We overrule the
City’s first cross-issue.

In its second cross-issue, the City asserts that a railroad
cannot condemn the property of a home-rule municipality that is already
dedicated to a specific public purpose, citing Rockport & P.A.R. Co. v.
State, 135 S.W. 263, 265 (Tex. Civ. App. 1911, no writ).  We have already rejected the City’s argument
that its status as a home-rule municipality can prohibit BNSF from using its
condemnation power in this case. 
Further, to the extent Rockport’s holding is somehow distinct
from the paramount public use test, if applying its holding would result in
elevating the City’s interest over the public interest in building the rail
line, as determined by the STB, and preventing the construction of the
railroad, then it is preempted as well. 
Therefore, we overrule the City’s second cross-issue.








Having disposed of all issues raised in
this appeal[11]
and having concluded that the county court correctly determined that the City’s
sovereign immunity has been waived but incorrectly determined that federal
preemption did not apply in this case, we reverse and remand for further
proceedings consistent with this opinion.

 

 

 

 

/s/      Leslie Brock Yates

Justice

 

 

 

 

Judgment
rendered and Majority and Concurring Opinions filed May 12, 2005.

Panel
consists of Justices Yates, Edelman, and Guzman (Edelman, J. concurring).











[1]  BNSF and
BayRail, LLC, a wholly-owned subsidiary of BNSF, own a 49% interest in SJRL.





[2]  According to
the STB, who filed an amicus brief in this appeal, “It is not uncommon for one
entity to hold title to the rail line, while another is the operator licensed
to provide the rail service over the line, as such arrangements advance a
variety of legitimate business purposes.”





[3]  Article 6336
is entitled “When corporation and owner disagree” and provides in pertinent
part:

 

If any railroad corporation shall at any time be
unable to agree with the owner for the purchase of any real estate, or material
thereon, required for the purpose of its incorporation or the transaction of
its business, for its depots, station buildings, machine and repair shops, for
the construction of reservoirs for the water supply, or for the right of way,
or for a new or additional right of way, for change, or relocation or road bed,
to shorten the line, or any part thereof, or to reduce its grades, or any of
them, or for double tracking its railroad or constructing and operating its
tracks, which is hereby authorized and permitted, or for any other lawful
purpose connected with or necessary to the building, operating or running its
road, such corporation may acquire such property by condemnation thereof. . . .
No railroad corporation shall have the right under this law to condemn any land
for the purposes mentioned in this article situated more than two miles from
the right of way of such railroad corporation.

 

Tex. Rev. Civ. Stat. Ann. art. 6336.





[4]  This case is
before us on appeal from the granting of a plea to the jurisdiction, though
many of the issues raised in this appeal, such as federal preemption and the
requirements of the railroad condemnation statute, are not traditionally
considered jurisdictional issues.  We
need not address whether such matters are properly raised in a plea to the
jurisdiction in a condemnation case because neither party has raised this
argument and, though the record is silent, BNSF represented without
contradiction at oral argument that all issues raised in this appeal were tried
by consent.  See Tex. R. Civ. P. 67; Frazier v.
Havens, 102 S.W.3d 406, 411 (Tex. App.—Houston [14th Dist.] 2003, no pet.)
(“A party’s unpleaded issue may be deemed tried by consent when evidence on the
issue is developed under circumstances indicating both parties understood the
issue was in the case, and the other party fails to make an appropriate
complaint.”).  Thus, even assuming that a
plea to the jurisdiction is not the appropriate vehicle for addressing issues
such as preemption, any such error is waived. 
See Whitten v. Vehicle Removal Corp., 56 S.W.3d 293, 298 (Tex.
App.—Dallas 2001, pet. denied) (“We need not decide, however, whether VRC
properly utilized a plea to the jurisdiction in this instance because Whitten
did not object to the plea below, nor does he complain on appeal of any defect
in the manner that the preemption issue was raised before the trial court.  Therefore, any such error was waived.”).





[5]  If property is
already devoted to public use, a condemning authority may not seek to condemn
that property if doing so would practically destroy its existing use unless it
shows that its intended use is of paramount public importance and that its
purpose cannot be otherwise accomplished. 
In re Burlington N. & Santa Fe Ry., 12 S.W.3d 891, 894 n.1
(Tex. App.—Houston [14th Dist.] 2000, orig. proceeding [mand. denied]) (citing Sabine
& E.T. Ry. v. Gulf & I. Ry., 46 S.W. 784, 786 (Tex. 1898)).





[6]  The City
stated at oral argument that South Dakota stands for the proposition
that only state economic regulations are preempted. Even assuming such a
distinction would impact this case since the requirements at issue would
prevent construction of the rail line, which certainly has economic
consequences, we disagree with this reading of South Dakota.  The court explicitly stated that “state
regulation of such areas [as economic, environmental, and public safety issues]
in the context of railroads is preempted by federal law.”  236 F. Supp. 2d at 1007; see also Friberg,
267 F.3d at 444 (holding that common-law negligence claim and application of
state criminal statute regarding blocking of roads by trains were preempted); City
of Auburn, 154 F.3d at 1031 (finding state environmental regulations were
preempted as applied to railroad).





[7]  The City’s
reliance on Hayfield Northern Railroad Co. v. Chicago & North Western
Transportation Co., 467 U.S. 622 (1984), is similarly misplaced.  Like South Dakota, Hayfield
merely stands for the proposition that federal railroad law does not preempt
the entire field of state eminent domain law. 
Id. at 632.





[8]  We note that
our holding applying federal preemption is consistent with the STB’s position
as reflected in the amicus brief it filed with this court.  See CSX, 944 F. Supp. at 1584 (noting
that because Congress delegated authority to the STB to implement the ICCTA,
the STB is “‘uniquely qualified’” to determine whether state law should be
preempted (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 496 (1996))); accord
Grafton & Upton R.R. v. Town of Milford, 337 F. Supp. 2d 233, 240 (D.
Mass. 2004).  The Association of American
Railroads, of which BNSF and UP are both members, and the American Chemistry
Council filed amicus briefs urging federal preemption as well.





[9]  Tex. Const. art. 10, § 1 (repealed), quoted
in Tex. Channel & Dock Co. v. State, 135 S.W. 522, 523 (Tex. 1911).





[10]  But see
Tex. Tpk. Auth. v. Shepperd, 279 S.W.2d 302, 361–62 (Tex. 1955) (finding
that statute granting Turnpike Authority power to condemn “any land . . .
necessary or appropriate for the construction or the efficient operation of any
Turnpike Project” allowed Turnpike to condemn property of home-rule
municipality); cf. Tex. Rev. Civ.
Stat. Ann. art. 6336 (“If any railroad corporation shall at any time be
unable to agree with the owner for the purchase of any real estate, or material
thereon, required for the purpose of its incorporation or the transaction of
its business . . . , such corporation may acquire such property by condemnation
thereof.”).





[11]  After this
appeal was filed and argued, BNSF and UP entered into an agreement for UP to
provide certain trackage rights to BNSF, which would allow BNSF to build a rail
line into the Bayport District.  The City
has filed a motion to dismiss, claiming this agreement constitutes a concession
by BNSF that it no longer needs to condemn the City’s property and therefore,
this appeal is moot.  BNSF disagrees that
its agreement with UP, to which the City is not a party, resolves its dispute
with the City or provides a complete substitute to the proposed rail line
through the City’s property because its trackage rights agreement with UP
provides only limited access to a portion of the Bayport District’s shippers.  BNSF further contends that the appeal is not
moot because the trial court awarded over $1,000,000 in attorneys’ fees and
expenses to the City under Tex. Prop.
Code Ann. § 21.019(c) (Vernon 2004), which provides for attorneys’ fees
and expenses to the property owner if the court grants a motion to dismiss the
condemnation proceeding.  Generally, a
case becomes moot when a court’s actions cannot affect the rights of the
parties.  Pinnacle Gas Treating, Inc.
v. Read, 104 S.W.3d 544, 545 (Tex. 2003). 
Neither party raised an issue contesting the award or amount of
attorneys’ fees, and thus we do not address the propriety of the trial court’s
decisions.  However, because the trial
court’s award of attorneys’ fees and expenses was contingent upon its properly
dismissing the condemnation proceeding, our reversal of the trial court’s
dismissal affects the City’s right to attorneys’ fees and expenses.  Thus, this appeal is not moot.  See id. at 545–46 (concluding that
appeal of dismissal of condemnation proceeding was not moot, despite condemnor
subsequently obtaining property by other means, because trial court awarded
over $100,000 in damages, expenses, and attorneys’ fees when dismissing
condemnation proceeding under section  21.019(c) and thus there was a live
controversy over correctness of trial court’s dismissal).  We overrule the City’s motion to dismiss.