# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

No. 00-40270

_____

GUNARD FRIBERG, Etc.; EL AL.,

        Plaintiffs,

GUNARD FRIBERG, Individually & as
Executor of the Estate of Martha Friberg,
Deceased; CARL FRIBERG,

        Plaintiffs-Appellees,

versus

KANSAS CITY SOUTHERN RAILWAY
COMPANY,

        Defendant-Appellant.

_____

Appeals from the United States District Court
for the Eastern District of Texas

_____

October 5, 2001

Before POLITZ and EMILIO M. GARZA,[*] Circuit Judges, and HEAD,[**] District
Judge.

_____

[*]Judge Emilio M. Garza concurs except as to footnote 18.

[**]District Judge of the Southern District of Texas, sitting by designation.

POLITZ, Circuit Judge:

The Kansas City Southern Railway Company appeals an adverse jury verdict finding it negligent and negligent *per se* for repeatedly blocking the primary road leading to the Fribergs' business, allegedly resulting in the failure of that business. Concluding that the causes of action asserted are preempted by the Interstate Commerce Commission Termination Act of 1995, we must reverse.

## BACKGROUND

In 1964 the Fribergs purchased a home and acreage near Leesburg, Texas, and began operating a landscape nursery there. The property was located along County Road 3540 just south of State Highway 11, and approximately 250 feet south of both the main line and a side track crossing CR 3540 operated by the Kansas City Southern Railway ("KCS"). Although customers could reach the nursery by two other routes that were not affected by the side track, CR 3540 was the primary access road because it was the most direct route from highway 11. Until the late 1990's the existing side track was seldom used as most trains operated by KCS exceeded the approximate 3300 foot length of the side track.[1]

_____

[1] Side tracks are used to park a train going one direction on a main line while a train going the opposite direction passes. They can also be used as a detour to circumvent places on the main line where the tracks become unusable due to washouts, accidents, maintenance, etc. Obviously, to allow a train going in the opposite direction to pass, the other train must be able to pull completely on to the side track leaving no cars on

In 1995, utilizing right-of-way it already owned, KCS lengthened the side track to more than 9900 feet so it could accommodate the longer trains it was operating. As a result of this improvement, in 1996 KCS began using the side track with increased frequency, which meant CR 3540 was blocked by waiting trains more often than in the past and customers using the road encountered delays in getting to or from the nursery.

The Fribergs experienced a general decline in business, occasioned by the county road blockages, and they contacted various authorities and railroad personnel in an attempt to alleviate the blocking problem. All efforts were to no avail. In 1998 the nursery was permanently closed and the Fribergs filed suit against KCS, alleging both negligence and negligence *per se*.[2]

KCS moved for summary judgment contending that the Fribergs' claims were preempted by the Interstate Commerce Commission Termination Act of 1995

---

the main line. The record reflects that the KCS has side tracks approximately every 20 miles along its main line between Shreveport, Louisiana, and Dallas, Texas.

[2] At the time of the events at issue TEX. TRANS. CODE ANN. § 471.007(a) ("Texas Anti-Blocking Statute") prohibited railroad officers, agents, servants or receivers from wilfully allowing a standing train to block a street, highway or railroad crossing for more than five minutes. That provision has since been amended to prohibit a railroad from permitting its train to block any street, highway or railroad crossing for more than ten minutes, extending the time limit and deleting the "standing train" limitation. The Fribergs also asserted claims for mental anguish, which were dismissed on a Motion for Directed Verdict.

("ICCTA"),[3] the Federal Railway Safety Act of 1970 ("FRSA"), and the Commerce Clause of the federal Constitution.[4] The trial court denied the motion and, after a trial, the jury found the railroad liable on both claims, but it could not reach a unanimous verdict on damages. The Fribergs and KCS then agreed to accept a less-than-unanimous verdict on the damages issue with both sides retaining all rights to appeal, and they agreed to specific terms respecting the damages due depending upon the outcome of any appeal.[5]

## ANALYSIS

**I     Consent Judgment**

We first address the Fribergs' motion asserting that the Final Judgment entered

---

[3]  49 U.S.C. § 10101, *et seq.*

[4]  49 U.S.C. § 20101, *et seq.*  At the close of evidence KCS also moved for directed verdict based on the same contentions.

[5]  The agreement states that if the judgment is appealed and affirmed, KCS will pay the Fribergs $120,000, or double the jury's award of $60,000 in damages; if the judgment is appealed and reversed and rendered KCS will pay nothing; and if the judgment is appealed and reversed and remanded the agreement will be null and void. Testimony relating to the damages agreement was sealed by the trial court at the request of the parties; however, both sides have disclosed the agreement's terms in their briefs, waiving any confidentiality of those terms. The Fribergs subsequently moved to dismiss the appeal, contending that the agreement rendered the Final Judgment filed in the case a consent judgment which, despite its language preserving both sides' appeal rights, could not be appealed. That motion has been carried with the case and for the reasons stated herein is denied.

in this case is a consent judgment not subject to appeal. The motion is resolved by a careful examination of the agreement between the Parties. The jury unanimously found the railroad liable on both the negligence and the negligence *per se* counts, but deadlocked 7-1 on damages, with the nigh-unanimous majority finding that the railroad owed the Fribergs $60,000. The Parties agreed to waive their rights to a unanimous verdict on the damages issue, and the February 14, 2000, Final Judgment reflects both that agreement and the express provision that "each party retain[s] all rights of appeal of that verdict the same as if it had been rendered unanimously."[6] Agreeing to accept a less-than-unanimous verdict, where the jury dictates the terms of the Judgment, is patently distinct from consenting to a Judgment wherein the Parties themselves settle and agree to all of the terms.[7] Nor do the agreement's terms conditioning damages to

---

[6] Indeed the record reflects that the issue whether or not there would be an appeal was specifically discussed during the announcement of the settlement agreement in court, and counsel for KCS bound the railroad to appeal when counsel for the Fribergs questioned what damages would be due if there was no appeal. Furthermore, counsel for the Fribergs agreed there would be no attempt to collect the judgment while the case was on appeal. It is apparent that both sides contemplated this appeal when agreeing to accept a less-than-unanimous verdict on damages.

[7] See, e.g., Vineyard v. Wilson, 597 S.W.2d 21, 23 (Tex. Civ. App. – Dallas 1980, no writ)("In order for a consent judgment to be valid, the parties must have definitely agreed to all the terms on which it was based. Nothing should be left for the court to provide.") Here, the Parties may be estopped from challenging the Judgment because it is based upon a less-than-unanimous verdict, but they are not estopped from challenging its validity as to liability.

be paid upon the outcome of the appeal transform the agreement into a consent judgment. As the Supreme Court found in Haven's Realty Corp. v. Coleman,[8] such an agreement merely liquidates the damages due. Accordingly, the Motion to Dismiss is denied.

## II    Preemption

Whether a state statute or common law cause of action is preempted by federal law is a question of law we review *de novo*.[9] Preemption under the Supremacy Clause of the federal Constitution may arise in several ways, *i.e.*, (1) express preemption where the intent of Congress to preempt state law is clear and explicit; (2) field preemption where state law intrudes in an area that Congress has reserved for federal jurisdiction; and (3) conflict preemption, where enforcement of state law cannot be accomplished while simultaneously complying with federal law.[10] Our analysis begins by looking to the expression of Congress, i.e., whether Congress either specifically stated that regulation of railroad operations and side tracks is reserved to the federal government, or implicitly so stated in defining the structure and purpose of the relevant

---

[8]  455 U.S. 363 (1981)(finding that an agreement tying the damages payable to whether the Supreme Court granted *certiorari* did not extinguish the claims so as to make the appeal moot).

[9]  Meredith v. Louisiana Federation of Teachers, 209 F.3d 398, 404 (5th Cir. 2000).

[10]  English v. General Electric Co., 496 U.S. 72 (1990).

federal legislation.[11]

*ICCTA*

The ICCTA became effective on January 1, 1996, abolishing the Interstate Commerce Commission and creating the Surface Transportation Board ("STB" or "Board") to perform many of the regulatory functions formerly performed by the Commission. Where a statute contains a specific preemption clause, the language of that clause becomes the focus of our analysis.[12] Section 10501 of the ICCTA is entitled General Jurisdiction, and states in relevant part:

> (b) The jurisdiction of the Board over –
>
> (1) transportation by rail carriers, and the remedies provided in this part [49 U.S.C. §§ 10101 et seq.] with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part [49 U.S.C. §§

---

[11] See, e.g., Shaw v. Delta Air Lines, Inc., et al., 463 U.S. 85, 95 (1982)(collecting cases).

[12] CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 664 (1993)("If the statute contains an express preemption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.").

10101 et seq.], the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

The language of the statute could not be more precise, and it is beyond peradventure that regulation of KCS train operations, as well as the construction and operation of the KCS side tracks, is under the exclusive jurisdiction of the STB unless some other provision in the ICCTA provides otherwise.[13] The regulation of railroad operations has long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce,[14] and it appears manifest that Congress intended the ICCTA to further that exclusively federal effort, at least in the economic realm.

The trial court, in finding no preemption, delved into the legislative history of the ICCTA. We respect that effort, but find that the plain language of the statute itself, and in particular its preemption provision, is so certain and unambiguous as to preclude any need to look beyond that language for congressional intent.[15] We cannot accept the

---

[13] Although railroad side tracks are under the exclusive jurisdiction of the STB, rail carriers do not need prior STB approval to construct and operate those tracks. 49 U.S.C. § 10906.

[14] See, e.g., City of Auburn v. United States, 154 F.3d 1025, 1029 (9th Cir. 1998)(collecting cases describing the history of federal railroad regulation).

[15] See Demarest v. Manspeaker, 498 U.S. 184, 190 (1991)("When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and

8

trial court's reasoning that the Texas Anti-Blocking Statute is a criminal provision that does not reach into the area of economic regulation of railroads. Regulating the time a train can occupy a rail crossing impacts, in such areas as train speed, length and scheduling, the way a railroad operates its trains, with concomitant economic ramifications that are not obviated or lessened merely because the provision carries a criminal penalty.

The Fribergs assert that § 10502 of the ICCTA, which is implemented through 49 C.F.R. § 1121.1 et seq., provides an exemption from the STB's jurisdiction. Section 10502, however, grants the power to exempt an entity to the Board itself, not to any other authority.[16] Further, § 10502 offers relief from administrative procedures for those seeking to acquire, operate or abandon rail lines, not to those seeking to regulate such rail operators.[17]

---

exceptional circumstances."); and United States v. Gonzalez, 520 U.S. 1, 6 (1997)("Given the straightforward statutory command, there is no reason to resort to legislative history.").

[16] Subsection 10502(a) states in relevant part: "In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Board under this part, *the Board*, to the maximum extent consistent with this part, *shall exempt* a person, class of persons, or a transaction or service . . . ." (emphasis added).

[17] See, e.g., 66 Fed. Reg. 31,275 (June 11, 2001)(STB granting rail carrier a track abandonment exemption); 66 Fed. Reg. 27,545 (May 17, 2001)(STB granting rail carriers and non-rail carrier holding company a change of control exemption); 63 Fed. Reg. 58,093 (October 29, 1998)(STB granting rail carrier a track purchase exemption);

Nothing in the ICCTA otherwise provides authority for a state to impose operating limitations on a railroad like those imposed by the Texas Anti-Blocking Statute, nor does the all-encompassing language of the ICCTA's preemption clause permit the federal statute to be circumvented by allowing liability to accrue under state common law, where that liability arises from a railroad's economic decisions such as those pertaining to train length, speed or scheduling. We thus hold that the Texas Anti-Blocking Statute, as well as the Fribergs' common law claim of negligence, are preempted by the ICCTA.[18]

_____

62 Fed. Reg. 39,593 (July 23, 1997)(STB granting rail carrier a rail construction and operation exemption); and 61 Fed. Reg. 46,901 (September 5, 1996)(STB granting rail carrier a track lease exemption). See also Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transportation Board, 2001 WL 584802 (3rd Cir. 2001)(discussing exemptions under § 10502 for rail carriers seeking to abandon rail lines); and Lee's Summit, Missouri v. Surface Transportation Board, 231 F.3d 39 (D.C. Cir. 2000)(discussing exemption granted to a rail carrier to restore service over a preexisting line). Anyone can petition to have an exemption revoked and seek judicial review of STB determinations. 49 U.S.C. § 10502(d); 49 C.F.R. § 1115.1 et seq.; and 49 C.F.R. § 1121.4(f). See e.g., City of Ottumwa v. Surface Transportation Board, 153 F.3d 879 (8th Cir. 1998)(denying city and labor union's petitions for review of STB's actions, which included denying their petitions to revoke an exemption granted under § 10502).

[18] Because of today's holding we need not and do not decide whether the Fribergs' claims are also preempted by the FRSA or the Commerce Clause of the federal Constitution. It is important to note that we are not faced with, and do not herein decide, what impact the ICCTA would have upon a state provision pertaining strictly to such traditionally state-controlled safety issues as local law enforcement and emergency vehicle access. That issue remains for another day and may have a substantially different result. Further, we recognize that our decision today could be

The judgment appealed is REVERSED.



interpreted by reasonable minds as allowing a taking without just compensation. Although the supremacy of federal law in the regulation of rail transportation cannot be denied, the federal government's failure to take appropriate steps to alleviate the blocking problems that the various state provisions have attempted to address enables the railroads to operate in such a manner as to severely diminish the use and value of private property without any compensation to those affected. That loss and the resolution thereof likewise remains for another day.