**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Appellant,**

v.

**The CITY OF HOUSTON, Texas, Appellee.**

No. 14–03–01311–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 12, 2005.

Rehearing Overruled Aug. 18, 2005.

Thomas E. Sheffield, League City, Murry B. Cohen and Kent Rutter, Houston, TX, for appellants.

Alan Brandt Daughtry, H. Dixon Montague, Houston, TX, Christa Leigh Dean, Evelyn G. Kitay, Washington, DC, for appellees.

Panel consists of Justices YATES, EDELMAN, and GUZMAN.

## MAJORITY OPINION

LESLIE BROCK YATES, Justice.

In this condemnation suit, appellant, The Burlington Northern and Santa Fe Railway Company ("BNSF"), is attempting to condemn an easement to build a federally-approved rail line through property owned by appellee, The City of Houston. BNSF appeals from the county court's dismissal of its condemnation suit. We reverse and remand.

## BACKGROUND

It has long been national policy to promote an adequate and efficient rail transportation service. *Norfolk & W. Ry. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 119, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991). In 1995, Congress passed the Interstate Commerce Commission Termination Act ("ICCTA"), which reinforced the federal government's continued goals "to promote a safe and efficient rail transportation system" and "to ensure development and continuation of a sound rail transportation system with effective competition among rail carriers." 49 U.S.C. § 10101(3), (4) (2000). To accomplish these and other goals, the ICCTA abolished the former Interstate Commerce Commission and created the Surface Transportation Board ("STB"), which has exclusive jurisdiction over transportation by rail carriers and the construction and operation of rail tracks. *Id.* § 10501(b).

Pursuant to its broad statutory powers, the STB played an integral role in the 1996 merger between Union Pacific ("UP") and Southern Pacific ("SP"), which was the

largest merger in American railroad history. In determining whether to approve the merger, the STB examined its impact on existing service and competition. The Bayport District in southeast Houston contains one of the largest concentrations of petrochemical producers in the world. Before 1996, SP was the sole rail service provider to this area through its Strang Subdivision line. However, the Bayport District was within a few miles of a nearby UP line called the GH & H line, which allowed for the possibility of competition through a build-out from the GH & H line to the Bayport District. Because the merger would result in UP owning both the Strang Subdivision and GH & H lines and therefore render the shippers in the Bayport District captive to UP, as a condition of the merger, the STB required UP to give its next largest remaining competitor, BNSF, trackage rights on the GH & H line. *See Union Pac. Corp.—Control & Merger—S. Pac. Rail Corp.*, STB Finance Docket No. 32760, 1996 WL 467636, at *7 (1996). These trackage rights would allow BNSF to build-out from the GH & H line to provide service to the Bayport District, thereby preserving the possibility of competition.

In June 2001, BNSF formed a Delaware limited partnership called San Jacinto Rail Limited ("SJRL") with four shippers in the Bayport District. The purpose of this partnership, of which BNSF was the dominant partner,[1] was to build a rail line from the GH & H line to the Bayport District using the trackage rights BNSF obtained in the UP/SP merger. Under their agreement, SJRL is to build the line, and BNSF is to have exclusive operational control.[2]

In August 2001, BNSF and SJRL filed a petition with the STB seeking authority for SJRL to construct and BNSF to operate this new 12.8 mile line. BNSF would be a common carrier and provide service to the four shippers partnered with BNSF as well as any other shipper who so requested.

In response to this petition, the STB initiated its lengthy evaluation process, including assessing the potential environmental impacts of the proposed rail line. This environmental impact assessment includes an analysis of a broad range of potential issues, including safety; noise and vibration; impacts on air, water, and soil; land use; hazardous materials issues; socioeconomics; cultural resources; and environmental justice. The STB sought public input in many ways, including establishing a toll-free hotline and holding two public meetings. The meetings were attended by nearly 200 people, and the STB received hundreds of written comments. In August 2002, the STB approved the proposal to build a new rail line, subject to the results of the ongoing environmental impact study. The STB explained that building this new line was in the public interest and consistent with national rail transportation policy in that it would allow suppliers to realize the benefits of competition and fulfill a condition of the UP/SP merger. The STB later issued a draft environmental impact statement and, after more public meetings and considering hundreds more written comments, a final environmental impact statement. Both the draft and the final statement were each several hundred pages long.

---

1. BNSF and BayRail, LLC, a wholly-owned subsidiary of BNSF, own a forty-nine percent interest in SJRL.

2. According to the STB, who filed an amicus brief in this appeal, "It is not uncommon for one entity to hold title to the rail line, while another is the operator licensed to provide the rail service over the line, as such arrangements advance a variety of legitimate business purposes."

The STB studied in detail five proposed routes for the line, each of which would run through the City's property. The City actively participated in the STB's assessment process, submitting detailed comments to the draft environmental impact statement and objecting to each of the proposed routes. The City even passed a resolution declaring its opposition to every route under consideration. BNSF worked with the STB to develop a route, called Route 1–C, to address some of the City's objections, but the City opposed this route as well. The STB determined that the new line would pose no significant environmental threats and approved all five lines, designating Route 1–C as the preferred route.

Route 1–C is to run through an undeveloped portion of Ellington Field, which is one of three airports in the Houston Airport System. Ellington Field is a small airport used mostly by the military and for corporate and private general aviation. It has been a constant financial drain on the airport system, and the City hopes to reverse that. The City objected to Route 1–C, claiming it would interfere with plans to develop the property for aviation-related business because, among other things, the line would bisect the property, allow the transportation of hazardous materials, and

make access to the property more difficult, thereby decreasing its marketability. The City also believes construction of the line would prevent the City from building a new road to make the property more accessible and relieve severe traffic congestion on nearby residential roads. The City presented these concerns and others to the STB, and the STB concluded that the proposed line would not significantly interfere with any reasonably foreseeable use the City had for its property.

The City filed a motion for reconsideration of the STB's decision and a motion for stay pending judicial review, *see* 49 C.F.R. § 1115.5(a) (2004), both of which the STB rejected. The City then filed a notice of appeal with the Fifth Circuit Court of Appeals, but the City dismissed that appeal, thereby making the STB's decision final. *See* 28 U.S.C. §§ 2321(a), 2342(5), 2344 (2000).

BNSF then attempted to purchase the necessary easement from the City to build along Route 1–C, but the City refused to sell. Therefore, BNSF commenced a condemnation action under Tex.Rev.Civ. Stat. Ann. art. 6336 (Vernon 1926), which authorizes a railroad to condemn land.[3] The City filed a plea to the jurisdiction, claiming immunity from suit and that BNSF had no right to take the property.[4] BNSF

---

**3.** Article 6336 is entitled "When corporation and owner disagree" and provides in pertinent part:

If any railroad corporation shall at any time be unable to agree with the owner for the purchase of any real estate, or material thereon, required for the purpose of its incorporation or the transaction of its business, for its depots, station buildings, machine and repair shops, for the construction of reservoirs for the water supply, or for the right of way, or for a new or additional right of way, for change, or relocation or road bed, to shorten the line, or any part thereof, or to reduce its grades, or any of them, or for double tracking its railroad or

constructing and operating its tracks, which is hereby authorized and permitted, or for any other lawful purpose connected with or necessary to the building, operating or running its road, such corporation may acquire such property by condemnation thereof. . . . No railroad corporation shall have the right under this law to condemn any land for the purposes mentioned in this article situated more than two miles from the right of way of such railroad corporation.

Tex.Rev.Civ. Stat. Ann. art. 6336.

**4.** This case is before us on appeal from the granting of a plea to the jurisdiction, though many of the issues raised in this appeal, such as federal preemption and the requirements

responded to each of the City's points and also asserted federal preemption. After a two-day trial, the county court dismissed the condemnation suit. In its findings of fact and conclusions of law, the court rejected BNSF's preemption argument, determining that state law controls, and found that although the City's sovereign immunity had been waived, BNSF did not have the right to take the property under state law.

In its first two issues, BNSF challenges the county court's conclusion that BNSF had no right to condemn the City's property under state law and asserts that, in any event, the county court's interpretation and application of state law conflicts with federal law and is therefore preempted. In its third issue, BNSF asserts that the county court erred in rejecting two of its three theories as to why the City's sovereign immunity has been waived. In its third cross-issue, the City challenges the county court's ruling that its sovereign immunity has been waived. In its first and second cross-issues, the City provides two alternative state law grounds it contends are bases for affirming the county court's judgment. We conclude that the City's sovereign immunity has been waived and that federal preemption precludes the county court's application of its interpretation of state law, and therefore we reverse and remand.

of the railroad condemnation statute, are not traditionally considered jurisdictional issues. We need not address whether such matters are properly raised in a plea to the jurisdiction in a condemnation case because neither party has raised this argument and, though the record is silent, BNSF represented without contradiction at oral argument that all issues raised in this appeal were tried by consent. *See* Tex.R. Civ. P. 67; *Frazier v. Havens*, 102 S.W.3d 406, 411 (Tex.App.-Houston [14th Dist.] 2003, no pet.) ("A party's unpleaded issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating both parties un-

### ANALYSIS

Our review of the county court's ruling on a plea to the jurisdiction is de novo, as is our review of the county court's conclusions of law and statutory interpretation. *See Nipper–Bertram Trust v. Aldine Indep. Sch. Dist.*, 76 S.W.3d 788, 791 (Tex.App.-Houston [14th Dist.] 2002, pet. denied); *TRST Corpus, Inc. v. Fin. Ctr., Inc.*, 9 S.W.3d 316, 320 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Attacks on the county court's factual findings are governed by a legal and factual sufficiency standard of review. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994).

### *Sovereign Immunity*

Sovereign immunity bars suits against the state unless the state has consented to suit. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 853 (Tex.2002). Cities, as political subdivisions of the state, are entitled to sovereign immunity unless it has been waived. *San Antonio Indep. Sch. Dist. v. McKinney*, 936 S.W.2d 279, 283 (Tex. 1996).

BNSF argues that immunity had been waived three ways: (1) by article 6336, which grants a railroad corporation the right to condemn "any real estate," under

derstood the issue was in the case, and the other party fails to make an appropriate complaint."). Thus, even assuming that a plea to the jurisdiction is not the appropriate vehicle for addressing issues such as preemption, any such error is waived. *See Whitten v. Vehicle Removal Corp.*, 56 S.W.3d 293, 298 (Tex.App.-Dallas 2001, pet. denied) ("We need not decide, however, whether VRC properly utilized a plea to the jurisdiction in this instance because Whitten did not object to the plea below, nor does he complain on appeal of any defect in the manner that the preemption issue was raised before the trial court. Therefore, any such error was waived.").

certain circumstances, (2) by Local Government Code section 51.075, which states that a home-rule municipality such as the City "may plead and be impleaded in any court," TEX. LOC. GOV'T CODE ANN. § 51.075 (Vernon 1999), and (3) by a provision in the City's charter that says the City may "sue and be sued" and may "implead and be impleaded." The county court found that the railroad condemnation statutes constituted an express waiver of immunity. The City challenges this finding in its third cross-issue. The county court rejected BNSF's other two theories, and BNSF complains of this in its third issue.

After the county court's ruling, this court determined that Local Government Code section 51.075 constitutes a waiver of the City's sovereign immunity. *City of Houston v. Clear Channel Outdoor, Inc.,* 161 S.W.3d 3, 8, 2004 WL 63561, at *4 (Tex.App.-Houston [14th Dist.] 2004, pet. filed). Therefore, we sustain BNSF's third issue as it relates to section 51.075. We need not reach the City's third cross-issue that the railroad condemnation statutes do not waive immunity since the City's immunity has been waived on another basis.

### *Federal Preemption*

■ The county court's ruling that BNSF did not have the right to condemn the City's property under state law was based on three separate conclusions. First, only railroad corporations have condemnation power under article 6336 and SJRL is not a railroad corporation. BNSF is the condemning entity, but it has agreed to transfer the condemned easement to SJRL, who is to build the rail line.

Article 6336 provides that a railroad corporation can condemn for any lawful purpose connected with building or operating "its road." The county court concluded that BNSF could not contract away its power of condemnation and since SJRL, not BNSF, would be the ultimate owner, the condemnation was unlawful since BNSF would not be condemning for "its road." Second, article 6336 provides that a railroad corporation may not condemn any land "situated more than two miles from the right of way of such railroad corporation." BNSF has trackage rights on the GH & H line, but the county court concluded that trackage rights are not a sufficient right of way under the statute because they are not fee simple ownership. Since BNSF has no other right of way within two miles of the property it is seeking to condemn, the county court concluded that condemnation was improper. Finally, under the common-law paramount public use test,[5] the county court concluded that construction of the rail line would practically destroy the City's plans of future aviation-related development at Ellington Field and construction of a new access road and that the City's planned public use was paramount to the public benefit of constructing the rail line.

BNSF challenges the correctness of the county court's interpretation of article 6336 and its conclusions in applying the paramount public use test. We need not determine whether the county court's interpretation and application of state law is correct because, even if correct, it conflicts with federal law and is therefore preempted.

---

5. If property is already devoted to public use, a condemning authority may not seek to condemn that property if doing so would practically destroy its existing use unless it shows that its intended use is of paramount public importance and that its purpose cannot be otherwise accomplished. *In re Burlington N. & Santa Fe Ry.,* 12 S.W.3d 891, 894 n. 1 (Tex.App.-Houston [14th Dist.] 2000, orig. proceeding [mand. denied]) (citing *Sabine & E.T. Ry. v. Gulf & I. Ry.,* 92 Tex. 162, 46 S.W. 784, 786 (1898)).

■ Preemption of state law by federal law is rooted in the Supremacy Clause of the United States Constitution. U.S. CONST. art. VI, cl. 2. The Supreme Court has determined that federal preemption can arise in three ways: (1) when Congress expressly provides that state law is preempted, (2) when congressional intent to exclusively occupy the field can be inferred from pervasive federal regulation, and (3) when state law actually conflicts with federal law. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

■ Where a statute contains a specific preemption clause, as does the ICCTA, that clause becomes the focus of our analysis. *Friberg v. Kansas City S. Ry.*, 267 F.3d 439, 442 (5th Cir.2001). The ICCTA section entitled "General Jurisdiction" states, in relevant part:

(b) The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501. As the Fifth Circuit stated in *Friberg*, "[t]he language of the statute could not be more precise." 267 F.3d at 443. Courts have consistently in-terpreted this preemption language to be broad in scope. *See, e.g., id.; City of Auburn v. United States*, 154 F.3d 1025, 1030–31 (9th Cir.1998); *Dakota, Minn. & E. R.R. Corp. v. South Dakota*, 236 F.Supp.2d 989, 1005 (D.S.D.2002), *aff'd in part & rev'd in part on other grounds*, 362 F.3d 512 (8th Cir.2004); *Wis. Cent. Ltd. v. City of Marshfield*, 160 F.Supp.2d 1009, 1013 (W.D.Wis.2000). Indeed, "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n*, 944 F.Supp. 1573, 1581 (N.D.Ga. 1996). As such, under principles of express and conflict preemption, courts have found that state laws that constitute regulation of a railroad are preempted. *See, e.g., Friberg*, 267 F.3d at 443; *City of Auburn*, 154 F.3d at 1031; *South Dakota*, 236 F.Supp.2d at 1006–07; *Wis. Cent.*, 160 F.Supp.2d at 1013–14.

In *South Dakota*, the court analyzed preemption in the context of South Dakota's eminent domain law. The railroad there applied to the STB for authority to build a new rail line, which the STB eventually approved. 236 F.Supp.2d at 996. While the railroad was waiting for the STB's approval, the state amended its formerly broad eminent domain law and added many new restrictions on a railroad's ability to condemn property. *Id.* at 997–98. Primarily at issue were the requirements that, before it could condemn property, a railroad have 100% financing for the project arranged and file a plat describing in intricate detail the exact route of the rail line. *Id.* at 998. The court found that both provisions constituted an impermissible regulation of the railroad and were expressly preempted because they would pose an "insurmountable barrier" for the railroad and therefore "completely

block[ ]" and "wholly prevent" the project.[6] *Id.* at 1006–07; *see also City of Auburn,* 154 F.3d at 1031 (concluding that any state law that prevents a railroad from constructing or operating a line constitutes an impermissible regulation); *Wis. Cent.,* 160 F.Supp.2d at 1013–14 (finding that city's attempt to condemn railroad property constituted a regulation and was therefore expressly preempted).

■ Here, the conditions the county court imposed on BNSF's use of its condemnation authority amount to regulation. The STB approved a new rail line to be owned and constructed by SJRL and operated by BNSF, its predominant partner. Under the county court's interpretation of article 6336, which focuses on the phrase "its road," BNSF and SJRL can never construct and operate the line in the manner approved by the STB. Similarly, because the STB-approved routes are not within two miles of any property BNSF owns, the county court's interpretation of the phrase "right of way" to require fee simple ownership as opposed to trackage rights means that BNSF cannot use its trackage rights on the GH & H line (acquired by STB order) to build the new line. Because these conditions wholly prevent construction of the STB-approved rail line, they constitute regulation and are preempted as applied to BNSF in these circumstances. *See City of Auburn,* 154 F.3d at 1031; *South Dakota,* 236 F.Supp.2d at 1006–07; *Wis. Cent.,* 160 F.Supp.2d at 1013–14.

■ The county court also applied the paramount public use test in a manner as to block the rail line. The STB, in its extensive two-year evaluation and approval process, reviewed the City's concerns over the proposed routes as well as hundreds of other comments and concluded that construction of this line, with eighty mitigating measures in place, was in the public interest and important to promote national rail transportation policy. The county court's application of the paramount public use test re-balanced a portion of these interests and placed the City's planned uses over the public interest and national rail transportation policies as determined by the STB, the agency with the expertise and exclusive jurisdiction to make such determinations. As such, the county court's application of the paramount public use test in these circumstances amounts to impermissible second-guessing of the agency's expertise and would prevent construction of the STB-approved rail line. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 326, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) ("Because Congress granted the exclusive discretion to make such judgments to the Commission, there is no further role that the state court could play."). Therefore, it is preempted as well. *See City of Auburn,* 154 F.3d at 1031; *South Dakota,* 236 F.Supp.2d at 1006–07; *Wis. Cent.,* 160 F.Supp.2d at 1013–14.

The City claims that *South Dakota* supports its argument that the county court's

---

6. The City stated at oral argument that *South Dakota* stands for the proposition that only state economic regulations are preempted. Even assuming such a distinction would impact this case since the requirements at issue would prevent construction of the rail line, which certainly has economic consequences, we disagree with this reading of *South Dakota.* The court explicitly stated that "state regulation of such areas [as economic, envi-

ronmental, and public safety issues] in the context of railroads is preempted by federal law." 236 F.Supp.2d at 1007; *see also Friberg,* 267 F.3d at 444 (holding that common-law negligence claim and application of state criminal statute regarding blocking of roads by trains were preempted); *City of Auburn,* 154 F.3d at 1031 (finding state environmental regulations were preempted as applied to railroad).

application of the railroad condemnation statute and the paramount public use test are not preempted in this case. As the *South Dakota* court noted, even the STB has acknowledged that eminent domain is a question of state law and a railroad is responsible for obtaining the land necessary to complete the project. 236 F.Supp.2d at 1009. "Thus STB approval of the [rail] project does not carry with it any federal power to take the land to complete the project. For such authority, [the railroad] is wholly dependent upon the State of South Dakota." *Id.* Because of this, the *South Dakota* court concluded that Congress did not intend the ICCTA to preempt the field of eminent domain law. *Id.* However, BNSF does not argue, and we do not hold, that the entire field of eminent domain law is preempted. Rather, we have determined that when state eminent domain law, as applied in the circumstances, amounts to a regulation by blocking a federally-approved rail line, it is expressly preempted.[7] The City also points to the court's finding that other portions of South Dakota's eminent domain statute requiring a showing of public use and necessity were not preempted. *Id.* at

1012. However, unlike in the present case, there was no indication that this requirement would completely prohibit construction of the rail line. *See id.*

Therefore, we sustain BNSF's first and second issues to the extent BNSF contends the county court's interpretation and application of state law is preempted.[8]

▇▇▇ In its first cross-issue, the City argues that BNSF cannot use its condemnation power in this case because the City, as a home-rule municipality, has the authority to prohibit the use of its grounds by a railroad. Tex.Rev.Civ. Stat. Ann. art. 1175, § 1 (Vernon Supp.2004–2005). A railroad's condemnation authority originated from the Texas Constitution,[9] and the legislature has specifically authorized a railroad corporation to condemn "any real estate" if it cannot agree with the owner for purchase and to construct and operate a railroad "between any points within this State," including on public lands. *See* Tex. Rev.Civ. Stat. Ann. arts. 6316, 6317, 6336 (Vernon 1929). Thus, even assuming article 1175 somehow trumps the legislature's specific grant of condemnation authority,[10]

7. The City's reliance on *Hayfield Northern Railroad Co. v. Chicago & North Western Transportation Co.*, 467 U.S. 622, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984), is similarly misplaced. Like *South Dakota, Hayfield* merely stands for the proposition that federal railroad law does not preempt the entire field of state eminent domain law. *Id.* at 632, 104 S.Ct. 2610.

8. We note that our holding applying federal preemption is consistent with the STB's position as reflected in the amicus brief it filed with this court. *See CSX*, 944 F.Supp. at 1584 (noting that because Congress delegated authority to the STB to implement the ICCTA, the STB is "'uniquely qualified'" to determine whether state law should be preempted (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 496, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996))); *accord Grafton & Upton R.R. v. Town of Milford*, 337 F.Supp.2d 233, 240

(D.Mass.2004). The Association of American Railroads, of which BNSF and UP are both members, and the American Chemistry Council filed amicus briefs urging federal preemption as well.

9. Tex. Const. art. 10, § 1 (repealed), *quoted in Tex. Channel & Dock Co. v. State*, 104 Tex. 168, 135 S.W. 522, 523 (1911).

10. *But see Tex. Tpk. Auth. v. Shepperd*, 154 Tex. 357, 361–62, 279 S.W.2d 302, 305–06 (1955) (finding that statute granting Turnpike Authority power to condemn "any land ... necessary or appropriate for the construction or the efficient operation of any Turnpike Project" allowed Turnpike to condemn property of home-rule municipality); *cf.* Tex.Rev. Civ. Stat. Ann. art. 6336 ("If any railroad corporation shall at any time be unable to agree with the owner for the purchase of any

the City's refusal to consent to any route (all of which run through the City's property) is but another form of regulation that prevents construction of this federally-approved line and is therefore preempted. *See City of Auburn,* 154 F.3d at 1031; *South Dakota,* 236 F.Supp.2d at 1006–07; *Wis. Cent.,* 160 F.Supp.2d at 1013–14. We overrule the City's first cross-issue.

In its second cross-issue, the City asserts that a railroad cannot condemn the property of a home-rule municipality that is already dedicated to a specific public purpose, citing *Rockport & P.A.R. Co. v. State,* 135 S.W. 263, 265 (Tex.Civ.App.1911, no writ). We have already rejected the City's argument that its status as a home-rule municipality can prohibit BNSF from using its condemnation power in this case. Further, to the extent *Rockport's* holding is somehow distinct from the paramount public use test, if applying its holding would result in elevating the City's interest over the public interest in building the

rail line, as determined by the STB, and preventing the construction of the railroad, then it is preempted as well. Therefore, we overrule the City's second cross-issue.

Having disposed of all issues raised in this appeal [11] and having concluded that the county court correctly determined that the City's sovereign immunity has been waived but incorrectly determined that federal preemption did not apply in this case, we reverse and remand for further proceedings consistent with this opinion.

EDELMAN, J., concurring.

RICHARD H. EDELMAN Justice, concurring.

The dismissal in this case could only properly be granted and affirmed based on a jurisdictional issue, such as governmental immunity from suit. Preemption is not

real estate, or material thereon, required for the purpose of its incorporation or the transaction of its business …, such corporation may acquire such property by condemnation thereof.").

11. After this appeal was filed and argued, BNSF and UP entered into an agreement for UP to provide certain trackage rights to BNSF, which would allow BNSF to build a rail line into the Bayport District. The City has filed a motion to dismiss, claiming this agreement constitutes a concession by BNSF that it no longer needs to condemn the City's property and therefore, this appeal is moot. BNSF disagrees that its agreement with UP, to which the City is not a party, resolves its dispute with the City or provides a complete substitute to the proposed rail line through the City's property because its trackage rights agreement with UP provides only limited access to a portion of the Bayport District's shippers. BNSF further contends that the appeal is not moot because the trial court awarded over $1,000,000 in attorneys' fees and expenses to the City under Tex. Prop.Code Ann. § 21.019(c) (Vernon 2004), which pro-

vides for attorneys' fees and expenses to the property owner if the court grants a motion to dismiss the condemnation proceeding. Generally, a case becomes moot when a court's actions cannot affect the rights of the parties. *Pinnacle Gas Treating, Inc. v. Read,* 104 S.W.3d 544, 545 (Tex.2003). Neither party raised an issue contesting the award or amount of attorneys' fees, and thus we do not address the propriety of the trial court's decisions. However, because the trial court's award of attorneys' fees and expenses was contingent upon its properly dismissing the condemnation proceeding, our reversal of the trial court's dismissal affects the City's right to attorneys' fees and expenses. Thus, this appeal is not moot. *See id.* at 545–46 (concluding that appeal of dismissal of condemnation proceeding was not moot, despite condemnor subsequently obtaining property by other means, because trial court awarded over $100,000 in damages, expenses, and attorneys' fees when dismissing condemnation proceeding under section 21.019(c) and thus there was a live controversy over correctness of trial court's dismissal). We overrule the City's motion to dismiss.

such an issue, either generally,[1] or in this particular case, because the county court will have subject matter jurisdiction over the condemnation action, even if some portions of the condemnation statute are preempted. Beyond recognizing that the dismissal cannot properly be affirmed on the preemption issue in any event (because it is not jurisdictional), any ruling in this appeal on preemption would go beyond the jurisdictional issues governing the dismissal to reach the merits of the underlying claims and thus be an advisory opinion which we have no jurisdiction to issue.[2] Therefore, our decision in this appeal should not address the preemption issue on the merits.

---

1. *See, e.g., Mills v. Warner Lambert Co.,* 157 S.W.3d 424, 427 (Tex.2005).

2. *See, e.g., McAllen Med. Ctr., Inc. v. Cortez,* 66 S.W.3d 227, 232 (Tex.2001).