KUHN, J.
| ¡.These proceedings involve a suit filed by the State of Louisiana (“the State”) against defendants, Illinois Central Railroad Company d/b/a/ Canadian National/Illinois Central Railroad (“ICRR”) and Capital Marine Supply, Inc. (“Capital Marine”). We consider the trial court’s ruling sustaining in part and denying in part ICRR’s exception raising the objection of lack of subject matter jurisdiction, and specifically whether the Interstate Commerce Commission Termination Act of 1995, Pub.L. No. 104-88, 109 Stat. 803 (1995), codified at 49 U.S.C. § 10101, et seq. (“the ICCTA”) preempts the State’s various claims, such that the trial court lacked subject matter jurisdiction to resolve them. The State seeks to be declared owner of certain property in question, to have competing interests in the property declared invalid and to recover various monetary awards for trespass and environmental damages. Additionally, the State seeks reimbursement for various economic benefits allegedly received by defendants and to recover costs incurred to clear the State’s title.
ICRR asserts the State’s suit is an attempt to force a railroad abandonment and that the question of abandonment is committed to the exclusive jurisdiction of the Surface Transportation Board (“STB”), before which neither party has instituted an abandonment proceeding. Considering the nature of the State’s claims and the language of the federal patent upon which the State’s ownership claim rests, we find the State’s claims cannot be resolved without first determining whether the property has ceased to be used or occupied as provided in the patent. Because the ICCTA expressly provides that exclusive jurisdiction over railroad abandonment proceedings rests with the STB and because the STB has not yet ruled upon the ^abandonment issue presented herein, we find the trial court did not have jurisdiction to resolve the claims set forth in the State’s petition. Accordingly, we conclude the trial court should have sustained the exception raising the objection of lack of subject matter jurisdiction with regard to all of the State’s claims.
I. FACTUAL AND PROCEDURAL BACKGROUND
In July 2000, the State filed a petitory action against defendants.[1] In its petition, the State claimed it was the legal owner of certain property located in East Baton Rouge Parish, which it described as follows:
A certain tract of land containing approximately 19.4 acres, situated in East Baton [Rouge] Parish, Louisiana, and being all of Sections 44 and 71, T-7-S, R-1W, St. Helena Meridian, lying westward of a line 100 feet east of the center *63 line of the railroad track of the Illinois Central Railroad Company, including any and all batture and accretions thereto, and all appurtenances and rights therein ... (the “Property”).
In its petition, the State alleged that: 1) prior to 1884, the Property formed part of a United States military garrison and barracks in Baton Rouge, Louisiana that was under the control of the Secretary of War; and 2) on September 6, 1884, the garrison was declared to be public lands of the United States, and control was transferred to the Secretary of the Interior of the United States by executive order.[2]
LA July 12, 1886 act of the Forty-Ninth Congress, Session 1, Chapter 765, 24 Stat. 144, provided, in pertinent part:
That the Secretary of the Interior ... is hereby authorized and directed to transfer to the Louisiana State University and Agricultural and Mechanical College, at Baton Rouge, possession of the buildings and grounds of the United States barracks at Baton Rouge, for the purposes of the said university and college, except that portion of said grounds that lies westward of a line one hundred feet east of the center of the railroad track of the Louisville, New Orleans, and Texas Railway Company, and said excepted lands may be used and occupied by said railroad company; but should said railroad company cease to use and occupy said lands, then the possession shall revert to the United States: PROVIDED HOWEVER, that the board of managers of the said university and college shall keep the buildings in good repair and insured for the use of the United States: AND PROVIDED, FURTHER, that whenever the said buildings and grounds cease to be used for educational purposes by the said university and college or when required by the Secretary of War for the use of the United States the possession of the same shall revert to the Government of the United States.
(Emphasis added.)[3]
An April 28, 1902 act of the 57th Congress, Public Law No. 85, provided with respect to the transfer of title to the military reservation:
That the Secretary of the Interior ... is hereby, authorized and directed to transfer to the Louisiana State University and Agricultural and Mechanical College at Baton Rouge, Louisiana, full and complete title to the buildings and grounds of the United States barracks at Baton Rouge for the purposes of said university and college, except that portion of said ground that lies westward of a line one hundred feet east of the center of the railroad track of the Louisville, New Orleans and Texas Railroad Company, and said excepted land may be used and occupied by said railroad company, and should said railroad cease to use and occupy said land then the title shall revert to said university.
(Emphasis added.)
LA federal patent, dated February 20, 1903, further provided in pertinent part:
That the United States of America ... in conformity with the provisions of the [above-referenced 1902 Act of Congress authorizing a transfer of title] have given and granted and by these presents do give and grant unto the Board of Super *64 visors of the Louisiana State University and Agricultural Mechanical College; in trust for said University and Agricultural and Mechanical College, all title of the United States to the buildings and grounds of the United States barracks at Baton Rouge, in the United States of Louisiana, for the purposes of said University and College, which said land has been surveyed and designated as Sections Forty-four and Seventy-one of township seven South of range one West, Saint Helena Meridian, State of Louisiana, containing two hundred and eleven acres and fifty-six hundredths of an acre, according to the official plat of survey returned to the General Land Office by the Surveyor General, excepting therefrom a parcel of ground containing about two acres and forty-five hundredths of an acre granted to the Roman Catholic Congregation of Saint Joseph’s Church of the- City of Baton Rouge, Louisiana, in trust for said congregation by Act of Congress, approved September 30, 1890 (26 Stats. 503) and further excepting therefrom that portion of land that lies westward of a line one hundred feet east of the center of the railroad track of the Louisiana, New Orleans and Texas Railroad Company, which land may be used and occupied by said railroad Company, but should said railroad cease to use and occupy the said land, then the title thereto shall vest in the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College in trust for said University and Agricultural and Mechanical College as aforesaid to have and to hold in trust, as aforesaid, all of said described land together with the buildings thereon, subject to the easement of the said Louisville, New Orleans and Texas Railroad Company, aforesaid unto the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College and its successors and assigns forever.
(Emphasis added.)
Based on these transactions, the State alleged that the fee simple title to the Property was transferred to the Board of Supervisors of Louisiana State |fiUniversity. By an authentic act dated January 11, 1951, the Board of Supervisors purported to formally donate and transfer record title to the Property to the State.[4]
When the State filed the present suit, however, it acknowledged it did not have possession of the Property. The parties stipulated that ICRR, a common carrier by rail, currently operates interstate rail service over tracks which are on and across the property described in the 1902 Act of Congress and the 1903 patent as the property which lies west of a line 100 feet east of the centerline of the tracks of the Louisville, New Orleans, and Texas Railway Company (“LNTR”). The parties also stipulated that ICRR is a successor to LNTR. The parties further stipulated that ICRR and its predecessors have continuously operated railroad tracks over the property for more than one hundred years, and they continue to do so presently.[5]
*65 The State’s petition addressed ICRR’s possession of the Property as follows, in pertinent part:
10.
Based on information and belief, at some time prior to the transfer of control of the Property to the Secretary of the Interior in 1884, the Secretary of War of the United States allowed the tracks of the New Orleans and Mississippi Valley Railroad (“NOMV”) to traverse a restricted portion of the grounds of the Garrison limited to the width of the tracks.
Jill-
The State believes that NOMV transferred any rights that it possessed in the Baton Rouge railway line to [LNTR]. The State further believes that the [LNTR] transferred any rights that it acquired to the Yazoo and Mississippi Valley Railroad Company (“Yazoo”), and that Yazoo transferred any such rights to ICRR, or its predecessor companies Illinois Central Gulf Railroad Company (“ICG”), and [ICRR].
12.
... [T]he State has been unable to locate any recorded act by which the United States and/or the State transferred any Interest in the Property to the Railroads. Further despite the State’s request that ICRR provide it with any document evidencing such Interest, ICRR has failed or refused to provide the requested documentation. For these reasons, the State believes that no written evidence of the transfer of any Interest in the Property to the Railroads exists.
The State further asserted that ICRR does not possess any interest in the Property that it is legally entitled to alienate and that ICRR’s execution of agreements with third parties related to the Property has created a cloud on the State’s title to the Property. The State also alleged that ICG, a predecessor corporation to ICRR, purportedly leased a portion of the Property to Capital Marine, which has conducted ship and boat supply, maintenance, and other operations on the Property. The State alleges that these operations have caused damage to the Property, reducing its value.
To the extent that ICRR’s use of the Property has exceeded using and maintaining its existing tracks across the Property, the State asserts ICRR has committed a trespass. The State further asserted that Capital Marine has committed trespass to the extent it has asserted any interest in the Property, conducted any business operations on the F'roperty, or attempted to assert possession of the Property.
|RThe State’s petition prayed for the recovery of damages from defendants and sought permanent injunctive relief prohibiting them from alienating any interest in the Property. The State prayed for judgment in its favor and against defendants, and specifically prayed for a judgment:
a. Declaring the State to be the sole owner of the Property;
b. Declaring all purported transfers, sales, purchase agreements, leases, licenses, encumbrances or other Alienations of any Interest in the Property by Defendants or any of their predecessors or successors null and void ...;
*66 c. Awarding general damages, in an amount sufficient to compensate the State for Defendants’ trespasses upon the Property;
d. Awarding general and special damages in an amount sufficient to compensate the State for any environmental or other damage to the Property, and for remediation of [any] such damage;'
e. Awarding recovery of any rentals, fees or other economic benefits received by Defendants or their predecessors as a result of any sale, purchase agreement, transfer, lease, license, encumbrance or other alienation of any right, title or interest in the Property;
f. Awarding the value of any minerals, soils, materials or other fruits or revenues removed from the Property;
g. Awarding but not limited to any costs, including legal fees, incurred by the State to remove and erase from the public records any instrument creating a cloud on the State’s title;
h. Ordering a permanent injunction prohibiting Defendants from transferring, selling, leasing, encumbering or otherwise alienating any Interest in the Property; and
i. Awarding any other legal or equitable relief to which the State may be entitled, together with legal interest from the date of judicial demand, and all costs of these proceedings.
During November 2003, in furtherance of its plans to construct a park on the Property, the State and its contractors began work on the Property without obtaining ICRR’s consent. ICRR’s railroad tracks sit upon a levee embankment. |flThe contractors’ work involved removing trees and excavating dirt from the Property. The excavation work involved cutting into the base of the levee embankment that supports the railroad track.[6] ICRR filed a request for injunctive relief, seeking to restrain the “forced abandonment/trespass and unlawful taking of property by the State .... ” The trial court granted a preliminary injunction in favor of ICRR, which prohibited the State and its contractors from conducting any construction, or preparatory work operations for construction, including any clearing, dirt moving, or excavation work upon the Property.
In response to the State’s petition, ICRR filed an exception raising the objection of lack of subject matter jurisdiction.[7] *67 In its exception, ICRR submitted that the deed the State relies on to establish its title “specifically excludes the property from what was transferred to LSU. As to the Property, LSU (and its |insuccessor, the State) could acquire title only in the event the railroad or its successors cease to use and occupy the Property.” ICRR urged, “the State seeks to be declared owner of the Property which includes [ICRR’s] main line railroad tracks and seeks to have this Court declare that [ICRR] has no rights to that property (and thus no right to operate its tracks over that Property).” ICRR contended that the STB has the exclusive authority to govern railroad operations, services and the abandonment of railroad rights-of-way. The parties stipulated that the State has not applied for and has not obtained a certifícate of abandonment from the STB. Thus, ICRR submitted that the trial court lacks subject matter jurisdiction over this action prior to any decision by the STB approving an abandonment of the railroad servitude/right-of-way or a cessation of railroad operations.
Following a hearing on the exception, the trial court signed a May 24, 2004 judgment, which sustained in part and denied in part the exception. The trial court sustained the exception “with regard to the State’s claims for trespass, damages, and recovery of any sums paid to [ICRR] (under paragraphs C and G of the prayer in plaintiffs petition).” The trial court denied the exception in all other respects. Both defendants appealed the judgment, challenging the portions of the judgment that denied in part ICRR’s exception. The State answered both appeals, asserting that the trial court has “full and complete jurisdiction over every issue in this matter.”
This court dismissed defendants’ appeals, finding the judgment was not final and appealable with respect to those portions of the trial court’s judgment that In denied ICRR’s exception.[8] However, the State’s answers to the appeal remain viable, and this court presently considers these answers pursuant to its appellate jurisdiction.
Upon dismissing ICRR and Capital Marine’s appeals, this court allowed both parties the opportunity to file an application for supervisory writs with this court. Although Capital Marine did not pursue this option, ICRR timely filed its application. We now also consider this writ application, 2005 CW 0886, in conjunction with the State’s answers.
II. ANALYSIS
In support of its writ application, ICRR argues that the State seeks to be declared the “sole owner” with exclusive authority over the Property and to have all encumbrances and alienations declared null and void. Thus, ICRR contends that the State is “seeking nothing less than a declaration that [ICRR] has no rights to this property (rail or otherwise)” and that “the State is ... attempting to force [ICRR] to involuntarily abandon [the] property.” ICRR urges that the State’s petition claims ownership of the property and its “appurtenances,” which term, ICRR asserts, is broad enough to include ICRR’s servitude/right-of-way and its railroad tracks.
*68 ICRR maintains that the United States Congress has fully legislated issues relating to interstate railroads in order to accomplish its objective of a uniform transportation system, and that pursuant to the ICCTA, Congress has expressly vested the authority to regulate railroad 'transportation with the STB. As such, | T JCRR urges the STB has the exclusive right to determine the issues presented in this case, and that Louisiana’s state courts do not have jurisdiction to determine title to property that is part of a railroad transportation system until the STB issues a certifícate of abandonment. ICRR argues the STB has exclusive and plenary authority over ICRR’s operation and its rights-of-way, including the abandonment of a right-of-way. Thus, it contends the State is required to seek a certificate of abandonment from the STB before it pursues any remedies based on state law. Additionally, ICRR posits that the State’s claims for monetary damages are solely related to ICRR’s railroad operations, and those claims are likewise preempted under the ICCTA. ICRR asserts the ICCTA does not require it to establish an ownership interest before the STB’s jurisdiction attaches.
In response, the State contends ICCTA preemption does not arise until á Louisiana court determines that ICRR validly possesses a recognized real right in the Property; the State asserts that ICRR has never validly acquired such a right. The State also argues that although the STB possesses jurisdiction over railroad aban-donments, this case does not involve a claim of abandonment. The State urges that it has not sought ICRR’s eviction, but has only sought a declaration that it owns the Property, restitution of funds received by ICRR, and damages occasioned by ICRR’s activities. The State further contends that because the STB only has jurisdiction if the trial court determines that ICRR validly owns some right in the Property, the trial court’s ruling finding its claims for monetary - damages to be preempted is premature and should be reversed. With respect to the scope and operation of the ICCTA, the State argues that the language of the act and the jurisprudence interpreting it do not support ICRR’s proposition that | ^Louisiana’s authority to determine title to real property or to rule on other state law causes of action is preempted in favor of the STB. The State contends that the STB has, in practice, deferred to state law and the rulings of state courts to determine real property rights.
In the State’s answers to the defendants’ appeals, it asserts that the portion of the trial court’s judgment that conferred jurisdiction to the STB over the State’s claim for monetary damages, its claims for costs incurred to clear the title to the Property, and its claim for legal fees incurred in clearing the title is erroneous and should be reversed.
A. Subject Matter Jurisdiction
Louisiana Code of Civil Procedure article 2 defines jurisdiction over the subject matter as the legal power and authority of a court to hear and determine a particular class of actions or proceedings, based upon the object of the demand, the amount in dispute, or the value of the right asserted. For the purpose of ruling upon an exception raising the objection of lack of subject matter jurisdiction, the court must accept the allegations of the petition as true. Banks v. Carl Ott Poles and Piling, Inc., 440 So.2d 803, 805 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1244 (La.1984). The party urging the exception has the burden of presenting sufficient evidence, documentary or testimonial, to sustain the merits of his exception. La. C.C.P. art. 930; Id.
*69 While the State in this case asserts that state courts have traditionally exercised jurisdiction over the various claims it has set forth in this case, the question presented is not whether state law gives state courts jurisdiction over | particular controversies but whether jurisdiction provided by state law is itself pre-empted by federal law vesting exclusive jurisdiction over that controversy in another body. International Longshoremen’s Ass’n, AFL-CIO v. Davis, 476 U.S. 380, 387-388, 106 S.Ct. 1904, 1910, 90 L.Ed.2d 389 (1986). It is clearly within Congress’ powers to establish an exclusive federal forum to adjudicate issues of federal law in a particular area that Congress has the authority to regulate under the Constitution. Id. Whether it has done so in a specific case is the question that must be answered when a party claims that a state court’s jurisdiction is preempted. The issue presented concerns congressional intent and the boundaries and character of a preempting congressional enactment. Id., 106 S.Ct. at 1910-11.
Preemption rests upon the supremacy clause of the federal constitution, and deprives a state of jurisdiction oyer matters embraced by a congressional act regardless of whether the state law coincides with, is complementary to, or opposes the federal congressional expression. Painters Local Union No. 567 of Broth. of Painters, Decorators and Paperhangers of America v. Tom Joyce Floors, Inc., 81 Nev. 1, 4, 398 P.2d 245, 246 (1965); see Bethlehem Steel Co. v. New York State Labor Relations Bd., 330 U.S. 767, 775-76, 67 S.Ct. 1026, 1031, 91 L.Ed. 1234 (1947). If a matter is preempted, a state court lacks subject matter jurisdiction to decide it. Walles v. Int’l Bhd. of Elec. Workers AF of L-CIO, 252 N.W.2d 701, 710(Ia.), cert denied, 434 U.S. 856, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977).
|1fiB. Preemption
The Supremacy Clause of the U.S. Constitution declares that “the laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2. Preemption “ ‘may be either express or implied, and is compelled whether Congress’ command is explicitly stated in the statute’s language or implicitly contained in its structure and purpose.” ’ Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992) (quoting FMC Corp. v. Holliday, 498 U.S. 52, 56-57, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990).
In 1995, Congress enacted the ICCTA, which abolished the Interstate Commerce Commission (ICC),. established the STB, and granted it jurisdiction over certain aspects of interstate rail activity. 49 U.S.C. §§ 10101-16106; In re Vermont Railway, 171 Vt. 496, 498, 769 A.2d 648, 651 (2000).[9] The Act was passed in an effort to deregulate the railroad industry and to remove state efforts to regulate the railroads. South Dakota ex rel. South Dakota R.R. Authority v. Burlington Northern & Santa Fe Ry. Co., 280 F.Supp.2d 919, 931 (D.S.D.2003); CSX Transp., Inc. v. Georgia Public Service Comm’n, 944 F.Supp. 1573, 1576 (N.D.Ga.1996). Congress and the courts have long recognized *70 a need to regulate railroad operations at the federal level. City of Auburn v. U.S. Government, 154 F.3d 1025, 1029 (9th Cir.1998), cert denied, 527 U.S. 1022, 119 S.Ct. 2367, 144 L.Ed.2d 771 (1999). Congress’ well-established authority to regulate the railroads is derived from the Commerce Clause. Id. (citing Houston, E. & W. Tex. Ry. v. United States, 234 U.S. 342, 350-52, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); Pittsburgh & Lake Erie R.R. v. Railway Labor Executives’ Ass’n, 491 U.S. 490, 510, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989)). As noted in City of Auburn, 154 F.3d at 1029, “the Supreme Court repeatedly has recognized the preclusive effect of federal legislation in this area. See, e.g., Colorado v. United States, 271 U.S. 153, 165-66, 46 S.Ct. 452, 70 L.Ed. 878 (1926) (ICC abandonment authority is plenary and exclusive); Transit Com’n v. United States, 289 U.S. 121, 127-28, 53 S.Ct. 536, 77 L.Ed. 1075 (1933) (ICC authority over interstate rail construction is exclusive); City of Chicago v. Atchison, T. & S.F. Ry., 357 U.S. 77, 88-89, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958) (local authorities have no power to regulate interstate rail passengers.)”
In the ICCTA, Congress broadened the express preemption provision at 49 U.S.C. § 10501(b), so that both the jurisdiction of the STB over transportation by rail carriers and the remedies provided under 49 U.S.C. §§ 10101-11908 are exclusive and preempt the remedies provided under Federal or state law. 49 U.S.C. § 10501(b); See City of Auburn v. STB, 154 F.3d at 1029-31. The federal courts have interpreted this preemption to be broad. Id. at 1030.
Initially, the State contends that the jurisdiction of the STB is not triggered because ICRR has not established that it holds a valid interest in the Property. We are not persuaded by this contention. Regardless of whether ICRR has a valid ownership or servitude interest in the land, ICRR and its predecessors have continuously operated railroad tracks over the Property at issue for over one 117hundred years, and ICRR continues to do so presently. Recognizing Congress’ well-established authority to regulate railroads, we conclude these facts are sufficient to trigger application of the ICCTA. Next, we must address the scope of this preemption.
As an interstate rail carrier, ICRR’s operations are subject to the jurisdiction of the STB as set forth in 49 U.S.C. § 10501(a) and (b). The STB has general jurisdiction over “transportation by rail carrier that is ... by railroad.” 49 U.S.C. § 10501(a)(1). Pursuant to 49 U.S.C. § 10501(b), the STB exercises exclusive jurisdiction over:
(1) transportation by rail carriers, and the remedies provided in [Part A, addressing rail transportation] with respect to rates, classifications, rules ..., practices, routes, services, and facilities of such carriers; and
(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located or intended to be located, entirely in one State.
“Transportation” as used in § 10501(b) is defined expansively to include, among other things, “property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use.” 49 U.S.C. § 10102(9)(A).
The ICCTA also contains an express preemption clause, which provides, “Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.” 49 *71 U.S.C. § 10501(b)(2). In interpreting this express preemption clause, the task of statutory construction must initially focus on the plain wording of the clause, which necessarily contains the l1sbest evidence of Congress’ preemptive intent. Friberg v. Kansas City Southern Ry. Co., 267 F.3d 439, 443 n. 12 (5th Cir.2001) (quoting CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)).[10]
In District of Columbia v. 109,205.5 Square Feet of Land, 2005 WL 975745, p. 3 (D.D.C.2005), the court recognized that courts throughout the country have interpreted the scope of this ICCTA preemption differently:
Courts have been split on the broadness of preemption under ICCTA; some have held it preempts all state efforts, City of Auburn, 154 F.3d at 1029-103[1030]; [Wisconsin Cent. Ltd. v. City of Marshfield, 160 F.Supp.2d 1009, 1013 (W.D.Wis.2000) ], and others have held it applies only to the regulation of rail transportation. [Iowa, Chicago & Eastern R.R. Corp. v. Washington County, Iowa, 384 F.3d 557, 561 (8th Cir.2004) ]; Fla. E. Coast R.R. Co. v. City of West Palm Beach, 266 F.3d 1324, 1331 (11th Cir.2001). Despite this split, the STB, which is the administrative body that governs railroad operations, has stated that “Federal preemption does not completely remove any ability of state or local authorities to take action that affects railroad property. To the contrary, state and local regulation, is permissible where it does not interfere with interstate rail operations.” Maumee & W. R.R. Corp. and RMW Ventures, LLC — Petition for Declaratory Order, 2004 WL 395835, at *1 (Surface Transp. Bd. Mar. 2, 2004); see also S.D. v. Burlington N. & Santa Fe R.R. Co., 280 F.Supp.2d 919, 931 (D.S.D.2003); Fla. E. Coast R.R. Co., 266 F.3d at 1330-31.
Based on the language of Section 10501(b), however, we conclude it is “manifestly clear that Congress intended to preempt ... state statutes, and any claims arising therefrom, to the extent that they intrude upon the STB’s exclusive jurisdiction over ‘transportation by rail carriers’ and ‘the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or | iaside tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.” ’ Railroad Ventures, Inc. v. Surface Transp. Board, 299 F.3d 523, 563 (6th Cir.2002) (citing 49 U.S.C. § 10501(b)).
At the hearing on the exception, John Dining, an ICRR engineer, who is also a manager of the railroad, testified that ICRR’s riverside track is a “main switching lead number one, which provides for industrial switching of the yard.” Thus, the parties do not challenge that ICRR’s track is an industrial, switching track. ICRR asserts that the State’s claims amount to a “forced abandonment” of its track and, thus, the claims are preempted pursuant to 49 U.S.C. § 10501(b)(2).
Thus, we consider whether the State’s claims fall within the preempted category of “abandonment.” Abandonment “is characterized by an intention of the carrier to cease permanently or indefinitely all transportation service on the relevant line.” Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, *72 314 n. 2, 101 S.Ct. 1124, 1128 n. 2, 67 L.Ed.2d 258 (1981) (quoting ICC v. Chicago & N.W. Transp. Co., 533 F.2d 1025, 1028 (8th Cir.1976).) A railroad line may be abandoned only upon a determination by the STB that abandonment is consistent with “present or future public convenience and necessity.” 49 U.S.C. § 10903(d).
In the present case, the State seeks to be declared the sole owner of the Property, including “all appurtenances and rights therein.” This language is broad and encompasses the ownership of ICRR’s railroad tracks. See Black’s Law Dictionary 111 (8th ed.2004) (defining “appurtenance” as “[sjomething that belongs or is attached to something else ....”); see also State Farm Fire & Cas. Co. v. Pfiffner, 399 So.2d 1250, 1252 (La.App. 1st Cir.1981). The State also Lpseeks a declaration that all purported transfers by ICRR’s predecessors are null and void; this relief is broad and encompasses any servitude rights that the predecessor railroad companies may have conveyed or transferred to ICRR. Additionally, the State seeks damages for trespass resulting from ICRR’s use of the Property. Thus, although the State did not use the word “abandonment” in its petition, this litigation seeks to effectively oust ICRR from the Property, or force it to abandon its tracks. We deem it appropriate to treat the State’s claim as a “forced” or “adverse” abandonment claim. See Louisiana & Arkansas Ry. Co. v. Bickham, 602 F.Supp. 383 (M.D.La.), aff'd, 775 F.2d 300 (5th Cir.1985), wherein the court determined that the property owner’s interference with a railroad’s use of servitude was unlawful and that the owner should have filed an application with the ICC to have the railroad line declared abandoned prior to destroying tracks that remained on the property in question.[11] The Bickham court, 602 F.Supp. at 384, found that extin-guishment of the servitude under Louisiana law would force the railroad to abandon this branch line, stating:
This is in direct conflict with § 10903, which prohibits an interstate rail carrier from abandoning a line without ICC approval. See ICC v. Chicago and North Western Transp. Co., 533 F.2d 1025, 1028 (8th Cir.1976). Thus, state law must yield to Congress’ “paramount control insofar as interstate commerce is involved.” Colorado v. United States, 271 U.S. 153, 165-66, 46 S.Ct. 452, 454-55, 70 L.Ed. 878 (1926); Kalo Brick, supra, 450 U.S. at 321, 101 S.Ct. at 1132.
Li Also see Cedarapids, Inc. v. Chicago, Central & Pacific RR Co., 265 F.Supp.2d 1005 (N.D.Ia.2003), wherein a lessee of real property subject to a railroad right of way sued a railroad-lessor in state court claiming that trackage covered by the right of way was abandoned under Iowa statutes and that the railroad-lessor misrepresented its intent to use trackage when entering into the subject lease. Upon removal to federal court, the court found that to the extent that plaintiffs state law claims sought to force the railroad to abandon the track in question, such claims were preempted by the ICC-TA.
Accordingly, we recognize that compliance with the intent of Congress cannot be avoided by mere artful pleading. See Chicago and North Western Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. at 324, 101 *73 S.Ct. at 1134.[12] The State’s attempt to force an abandonment of the Property cannot be ignored. To do so would be to ignore the STB’s authority.[13] Because the State’s claims seek to |saforce ICRR to abandon the track in question, its claims are preempted by the ICCTA.
.The State contends that its suit advances causes of actions that are traditionally reserved to the jurisdiction of Louisiana’s state courts. Specifically, the State urges that Louisiana courts have subject matter jurisdiction to determine the nature and extent of real rights in Louisiana property before any consideration of abandonment is material. The State urges that the preemptive effect of ICCTA precludes only state laws that impose economic regulation of rail transportation.
We recognize that the STB has acknowledged the jurisdiction of a state court to rule on underlying issues of state property law in the proceeding of Central Kansas Railway, Limited Liability Company— Abandonment Exemption — in Marion and McPherson Counties, KS, 2001 WL 489991 (STB 5/3/01). The STB has also recognized that a contractual dispute respecting the scope of the rights retained by or granted by the State under an operating agreement with a rail carrier must be resolved in a state court proceeding. See The Burlington Northern and Santa Fe Railway Co. — Acquisition and Operation Exemption — State of South Dakota, 2005 WL 79210 (STB 1/14/05). Thus, the STB does not operate without regard to State’s rights.
Initially, the State’s argument that ICC-TA preemption does not extend to its state law claims is compelling. Upon closer examination, however, it is apparent that the state’s claims are derived from the 1903 *74 federal patent, and all of the ^State’s claims are interwoven with the issue of whether the Property has ceased to be used or occupied as provided in the patent. The patent excludes the Property in dispute from the property transferred and directs that “should said railroad cease to use and occupy the [Property] then the title thereto shall vest in [LSU’s Board of Supervisors].” Thus, whether a reversion-ary interest has been triggered is dependent upon a determination regarding abandonment. See National Wildlife Federation v. I.C.C., 850 F.2d 694, 703 (D.C.Cir.1988). Since the State’s remaining claims are contingent upon its claim that it owns the Property, none of the claims can be determined before the abandonment issue is addressed by the STB. Thus, we conclude that the ICCTA preemption encompasses all of the claims advanced by the State. Once the STB addresses the abandonment issue, the state court will be able to exercise its jurisdiction to address any state law issues that may remain. See Hayfield Northern R. Co., Inc. v. Chicago and North Western Transp. Co., 467 U.S. 622, 634, 104 S.Ct. 2610, 2617, 81 L.Ed.2d 527 (1984) (quoting Abandonment of Railroad Lines and Discontinuance of Service, 365 I.C.C. 249, 261, 1981 WL 22683 (1981)); Louisiana & Arkansas Ry. Co. v. Bickham, 602 F.Supp. at 385, n. 5 v. Accordingly, we find the trial court lacked subject matter jurisdiction to adjudicate the State’s claims prior to a ruling by the STB regarding abandonment, and the trial court should have sustained ICRR’s exception as to all of the State’s claims.
III. CONCLUSION
Since we find merit in ICRR’s exception, ICRR’s application for supervisory writs is granted. For the reasons stated, we affirm those portions of the trial court judgment that sustained ICRR’s exception, we reverse those [¡.¿portions of the judgment that denied ICRR’s exception, and we deny the State’s answers. Appeal costs in the amount of $1,249,14 are assessed against the State.
WRIT GRANTED AND MADE PEREMPTORY; TRIAL COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.

. Besides ICRR and Capital Marine, the State also named CTC Minerals, Inc. as a defendant. CTC was later dismissed from the suit and is not involved in the proceedings before this court.

. The parties stipulated that the Property at issue was formerly part of a military reservation in Baton Rouge.

. By Concurrent Resolution No. 97, approved July 8, 1886, the Louisiana Legislature accepted the transfer of the property referenced in the 1886 Congressional act.

. By Acts Í950, No. 191, the Louisiana legislature authorized the Board of Supervisors of LSU to donate and transfer "all ... parcels of land and all buildings and improvements thereon, now owned or claimed by said Board of Supervisors, including all rights of reverter or otherwise therein that compose a portion of the Old Campus of [LSU], situated in the Northern portion of the City of Baton Rouge
[[Image here]]

. The State asserted in its petition, however, that the right conveyed by the United States to the Louisville, New Orleans, and Texas Railway Company was the limited right to use and maintain its existing tracks across the Property. It asserts that ICRR did not ac *65 quire any interest in the Property directly from the United States, and that it does not have any greater interest than its predecessors in title.

. John Dining, an engineer employed by ICRR, explained that the excavation work impacted the toe of the levee, which he described as "the base where the embankment stops and levels out going to the even ground.” He stated the toe of the levee is part of the support structure of the railroad track and part of the support structure for the levee itself. Dining further testified that the Property is párt of ICRR’s emergency preparedness system. He explained it is the only sizable piece of undeveloped property in the Baton Rouge area available for ICRR's use in the event of an emergency. In the event of a derailment, he explained the Property would be used for equipment staging and for storing supplies for work on the rail lines.
Dining testified that the excavation work performed by the State threatened the integrity of the railroad tracks. He explained that the soil removal had created drainage problems, which had created the start of some washouts and an area of actual collapse. Dining indicated these were signs of destabilization. The excavation work had also destroyed all of the vegetation growing along the railroad embankment that had previously provided support for the embankment. In his opinion, the State's work on the Property had increased the risk of a railroad derailment.

. ICRR had previously removed the State's action to federal court by filing a third-party demand against the United States of America ("the United States”). Pursuant to a June 27, *67 2002 ruling on a motion to dismiss for lack of subject matter jurisdiction, the United States District Court for the Middle District of Louisiana confirmed the United States' full disclaimer of its interest in the disputed property and granted the United States’ motion to dismiss the third party complaint for lack of subject matter jurisdiction pursuant to Federal Rules of Civil Procedure Rule 12(b)(1).

. See this court's order of dismissal dated April 18, 2005.

. Under the ICCTA, the functions of the ICC were transferred to the STB on January 1, 1996. Phillips Co. v. Denver and Rio Grande Western R. Co., 97 F.3d 1375, 1376 n. 2 (10th Cir. 1996), cert. denied sub nom. Phillips Co. v. Southern Pacific Rail Corp., 521 U.S. 1104, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997). The STB was established within the United States Department of Transportation, 49 U.S.C. § 701.

. The courts have observed, "It is difficult to imagine a broader statement of Congress’s intent to preempt state regulatory authority over railroad operations” than that contained in Section 10501(b). CSX Transp., Inc. v. Georgia Public Service Comm’n, 944 F.Supp. at 1581.

. In Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 145, 66 S.Ct. 937, 944, 90 L.Ed. 1132 (1946), the Supreme Court recognized that an application for abandonment can be made by persons other than carriers "who have a proper interest in the subject-matter.” (quoting Atchison, T. & S.F. Ry. Co. v. Railroad Commission, 283 U.S. 380, 393-394, 51 S.Ct. 553, 556-557, 75 L.Ed. 1128 (1931)).

. In the Kalo Brick & Tile decision, the Supreme Court ruled on the extent of the preemptive effect of section 1(18) of the Interstate Commerce Act, the predecessor to 49 U.S.C. § 10901, as it applied to railroad abandonment.

. Our research reveals a number of cases involving various types of actions where the courts concluded that a determination regarding abandonment by the ICC (in cases occurring before the enactment of ICCTA) was a prerequisite to proceeding in either state or federal court. See Phillips Co. v. Denver & Rio Grande Western Railroad Co., 97 F.3d at 1377 (finding that an authorization of abandonment from the ICC was needed before the court could adjudicate the claims presented in a suit to quiet title to a right of way underlying a rail line); City of Des Moines, Iowa v. Chicago & N.W. Ry. Co., 264 F.2d 454, 457 (8th Cir. 1959) (finding that regardless of whether a valid forfeiture would have existed under a city ordinance, a court could not decree an ouster of the railway from the street, so long as this might mean an abandonment or discontinuance of a portion of the railway's line or operation in the interstate field, until the ICC gave its permission to such abandonment or discontinuance.being made); Phillips Co. v. Southern Pacific Rail Corp., 902 F.Supp. 1310, 1312 (D.Colo.1995), aff’d sub nom., 97 F.3d 1375 (10th Cir.1996), cert denied, 521 U.S. 1104, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997) (court found abandonment could not occur without prior authorization by the ICC in a suit where plaintiff alleged he owned a portion of a railroad right-of-way as a result of an alleged de facto abandonment); Trustees of the Diocese of Vermont v. State, 145 Vt. 510, 515, 496 A.2d 151, 154 (1985) (Landowners' state court action requesting disposition under state law that railroad easement had been abandoned interfered with federal regulation of interstate commerce, where no abandonment proceedings before ICC had been commenced and there had been no authorization from the ICC permitting railway to discontinue service, and thus, state court lacked subject matter jurisdiction); and Mobile & Gulf R. Co. v. Crocker, 455 So.2d 829, 832 (Ala.1984) (trial court did not have jurisdiction to hear petition brought by landowner requesting declaration that railroad's right-of-way across his property had been abandoned,' since ICC had exclusive jurisdiction over abandonment of railroad rights-of-way).